Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Estado Libre Asociado de Puerto Rico y el Secretario del Departamento de Hacienda<br><br>Recurridos<br><br>v.<br><br>Northwestern Selecta, Inc.<br><br>Peticionaria | Certiorari<br><br>2012 TSPR 56<br><br>185 DPR ____ |

Número del Caso: CC-2009-1091

Fecha: 27 de marzo de 2012

Tribunal de Apelaciones:

Región Judicial de San Juan, Panel II

Abogados de la Parte Peticionaria:

Lcdo. Rafael Escalera Rodríguez
Lcdo. Andrés Ramírez Marcano

Oficina del a Procuradora General

Lcda. Leticia Casalduc
Subprocuradora General

Lcda. María A. Hernández Martín
Procuradora General Auxiliar

Materia: Derecho Constitucional – Cláusula de Comercio Interestatal bajo la Constitución de Estados Unidos, en su fase durmiente; Constitucionalidad de la Ley 95 de 1992 en su aplicación a la industria de la carne de res

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| ESTADO LIBRE ASOCIADO DE PUERTO RICO Y EL SECRETARIO DEL DEPARTAMENTO DE HACIENDA<br><br>Recurridos<br><br>v.<br><br>NORTHWESTERN SELECTA, INC.<br><br>Peticionaria | **Núm. CC-2009-1091** | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 27 de marzo de 2012.

La controversia planteada a través de este recurso incide en las limitaciones a la facultad reguladora del Gobierno de Puerto Rico (Gobierno) en aquellos asuntos donde se ve afectado el comercio interestatal. Ésta se circunscribe a determinar si es constitucional una ley que le impone a una parte pagar contribuciones que culminan en el financiamiento de una campaña publicitaria que atenta contra sus intereses económicos. Para poder atenderla nos toca resolver en esta ocasión si la Cláusula de Comercio de la Constitución de los Estados Unidos de América (Constitución Federal) en su aspecto durmiente aplica a Puerto Rico.

## I

La controversia trabada en este recurso tiene su génesis en una Demanda en Cobro de Dinero instada por el Gobierno a través del Secretario de Hacienda reclamando de Northwestern Selecta, Inc. (Northwestern o la peticionaria), en su calidad de importadora de carne de res en Puerto Rico, el pago de aportaciones presuntamente adeudadas al Fondo para el Fomento de la Industria de la Carne de Res (Fondo), según provisto en la Ley Núm. 95-1992 (5 L.P.R.A. secs. 3001-3012 (2005)) (Ley 95).

Northwestern, por su parte, ha resistido reiteradamente los intentos de cobro del Gobierno levantando como defensa, entre otros, la inconstitucionalidad de la Ley 95.

Los argumentos legales interpuestos por la peticionaria como fundamento para oponerse al pago de la deuda en cuestión fueron descartados por el foro primario. A estos efectos, el Tribunal de Primera Instancia (TPI) denegó la solicitud de sentencia sumaria sometida por Northwestern concediendo en su lugar la contrapropuesta del Gobierno validando de este modo el cobro de los dineros exigidos en la Demanda ascendentes a trescientos un mil quinientos veintiséis dólares con veintiocho centavos ($301,526.28).

Por su parte, el Tribunal de Apelaciones no encontró vicio constitucional en el estatuto en controversia bajo la rúbrica de la primera enmienda de la Constitución

Federal. Asimismo, declinó entrar a considerar su impugnación a base de la Cláusula de Comercio en su estado durmiente por no haberse presentado dicho cuestionamiento oportunamente ante el foro primario y por existir alternativas dispositivas del caso. Tampoco encontró justificación legal para impedir el ingreso de los dineros recaudados bajo la Ley 95 a un fondo creado en virtud de la Ley Núm. 238-1996 (5 L.P.R.A. secs. 3051-3061 (2005)) (Ley 238). Por último, dispuso que la deuda según decretada por el TPI era correcta, por lo que Northwestern venía obligada a satisfacer el monto total reclamado por el Departamento de Hacienda.

Inconforme, la parte peticionaria acude ante nos señalando los siguientes errores:[1]

> PRIMER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE APELACIONES AL DETERMINAR QUE LA INTENCIÓN LEGISLATIVA DE LA DEROGADA LEY 95, SEGÚN IMPLANTADA, NO ERA PROMOCIONAR LA CARNE DE RES DEL PAÍS PARA CONTRARRESTAR EL EFECTO NEGATIVO OCASIONADO POR LAS IMPORTACIONES DE CARNE A PUERTO RICO. EL TRIBUNAL BASÓ SU DETERMINACIÓN EN EL TEXTO ESCRITO DE LA LEY NÚM. 95; NO EN SU HISTORIAL LEGISLATIVO NI EN SU APLICACIÓN.
>
> ....
>
> TERCER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE APELACIONES AL NEGARSE A CONSIDERAR QUE EL PAGO DE LA APORTACIÓN ORDENADA POR EL TRIBUNAL DE PRIMERA INSTANCIA VIOLA LA CLÁUSULA DE COMERCIO INTERESTATAL DE LA CONSTITUCIÓN DE LOS ESTADOS UNIDOS EN SU "ESTADO DURMIENTE" ("DORMANT COMMERCE CLAUSE").

---

[1] Como discutiremos más adelante, solamente atenderemos el primer y tercer error señalados.

Evaluado el recurso, acordamos expedir. Contando con el beneficio de la comparecencia de ambas partes, procedemos a resolver sin trámite ulterior.

## II

En su escrito, la parte peticionaria plantea que la interpretación dada por el Tribunal de Apelaciones a la Ley 95 resulta contraria a su historial legislativo. En apoyo a su postura, Northwestern sostiene que la Ley 95 es inconstitucional al utilizarse dineros del Fondo para la promoción exclusiva de la industria pecuaria local, contrario a los intereses de los importadores de carne de res, y menoscabando de este modo sus garantías constitucionales a la libre asociación y expresión. Argumenta también que la aportación preceptuada por dicha disposición estatutaria contraviene la Cláusula de Comercio de la Constitución Federal en su estado durmiente. Por último, impugna la validez de la Ley 238 en tanto y en cuanto requiere que los dineros previamente aportados por los importadores de carne conforme la Ley 95 sean asignados a un fondo constituido por operación del estatuto promulgado.

## III

### LEY 95 y LEY 238

#### A. Ley 95

#### OFICINA REGLAMENTACIÓN

La Ley 95, conocida como *Ley para Crear la Oficina de la Reglamentación y Promoción de la Industria de la Carne*

*de Res,* fue aprobada el 29 de noviembre de 1992 y estuvo en vigor hasta el 31 de diciembre de 1996. En términos generales, las funciones encomendadas a la entidad creada iban dirigidas a "poner en vigor programas y medidas orientadas a propiciar el desarrollo de una industria ganadera, próspera, así como resolver diferentes situaciones o problemas relacionados con la producción, promoción, distribución y venta de la carne de res". Art. 3 (5 L.P.R.A. sec. 3002 (2005)). Con el objetivo de asegurar el "desarrollo y fortalecimiento de la industria de la carne de res en Puerto Rico", se delegó en la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res (Oficina de la Reglamentación) las siguientes encomiendas:

(1) Promover la producción y consumo de carne de res, así como estimular y fortalecer el establecimiento de nuevas unidades de producción a ser administradas individualmente o mediante cooperativa, sociedades, corporaciones o grupo de personas.

(2) Promover el mercadeo ordenado tanto de la carne de res producida localmente así como la importada.

(3) Ofrecer a los productores, así como a los importadores de carne de res los servicios de asesoramiento técnico en las áreas de producción, venta, mercadeo, importación y en las prácticas de administración de unidades productoras.

Art. 4 (5 L.P.R.A. sec. 3003 (2005)).

Del propio texto del estatuto se desprende su propósito dual de beneficiar tanto la industria local como

los intereses de los importadores. Ello se consigna al (1) procurar atender las necesidades de los productores locales; (2) aumentar las ventas a través de un mercadeo sistematizado, a la vez de (3) proveer asesoramiento técnico. Estas dos últimas encomiendas sirven de provecho igualmente a los importadores.

Conforme el esquema estatutario, la Oficina de la Reglamentación quedó a cargo de un Administrador nombrado por el Secretario de Agricultura. Art. 5 (5 L.P.R.A. sec. 3004 (2005)). Entre sus funciones se destacan promover iniciativas dirigidas al consumidor; procurar una mayor participación de los productores e importadores en las iniciativas gubernamentales atinentes a la producción y mercadeo; recopilar y publicar información pertinente y estadísticas para la evaluación de la política pública e investigar las transacciones y relaciones comerciales de los diversos componentes de la industria local, así como los importadores. Art. 6 (5 L.P.R.A. sec. 3005 (2005)).

**FONDO PARA EL FOMENTO DE LA INDUSTRIA
DE LA CARNE DE RES**

Con el propósito de adelantar el cumplimiento de los objetivos enunciados de propulsar el mejoramiento de este renglón de la economía, la Ley 95 conjuntamente decretó la creación del Fondo. Según estatuido, el presupuesto del Fondo provendría de dineros aportados tanto por los

productores como los importadores de carne conforme la siguiente fórmula: (1) cuatro dólares con catorce centavos ($4.14) por cada animal sacrificado en matadero; (2) un centavo (1¢) por libra de carne de res importada y (3) un dólar ($1) por cada ternero sacrificado en matadero. Art. 9 (5 L.P.R.A. 3008 (2005)).

Se facultó al Secretario de Hacienda a cobrar las aportaciones establecidas por ley sobre la carne de res importada. Art. 11 (5 L.P.R.A. sec. 3010 (2005)).

El diez por ciento (10%) de las cantidades recaudadas fueron destinadas a la Oficina de la Reglamentación para cubrir sus gastos administrativos y operacionales. Art. 4 (5 L.P.R.A. sec. 3003 (2005)). De otra parte, se dispuso que los dineros allegados debían de ser utilizados "para la promoción de la producción, venta, elaboración y consumo de la carne de res, y toda otra gestión necesaria para el progreso de la industria de la carne de res." Art. 9 (5 L.P.R.A. sec. 3008 (2005)).

La administración del Fondo recayó sobre una Junta Administrativa (Junta Administrativa) constituida por el Administrador, en calidad de miembro *ex officio*, dos (2) representantes de los importadores y tres (3) de los productores, así como un (1) representante del interés público. Una vez constituida dicha Junta Administrativa, ésta nombraría su Presidente. Art. 10 (5 L.P.R.A. sec. 3009 (2005)).

**B. Ley 238**

### OFICINA DE ORDENAMIENTO DE LAS INDUSTRIAS
### AGROPECUARIAS DE PUERTO RICO

Aproximadamente cuatro años más tarde,[2] en virtud de la Ley 238, conocida como *Ley para el Ordenamiento de las Industrias Agropecuarias de Puerto Rico*, se derogaron todas aquellas disposiciones de la Ley 95 que se hallaran en conflicto con el nuevo estatuto. La Ley 238 dispuso para la creación de la Oficina de Ordenamiento de las Industrias Agropecuarias de Puerto Rico, adscrita al Departamento de Agricultura. Art. 3 (5 L.P.R.A. sec. 3052 (2005)).

Dirigida a promover el desarrollo de las industrias agropecuarias en la Isla, con particular énfasis en el mercadeo de sus productos, la Ley 238 cambió el enfoque que perseguía la Ley 95. El nuevo estatuto se circunscribió a atender la gestión empresarial local en el sector agropecuario, dejando fuera de su ámbito el quehacer comercial de los importadores de carne de res. Asimismo, organizó su esfera de poder aglutinando bajo su competencia diversas industrias relacionadas a este renglón de la economía, entre ellas, la Oficina de Reglamentación de la Industria Lechera, la Oficina para la Promoción y Reglamentación de la Agroindustria del Caballo de Paso Fino de Puerto Rico, la Oficina de la

_____

[2] La Ley 238 entró en vigor el 1 de enero de 1997. Art. 15 de la Ley 238.

Reglamentación y Promoción de la Carne de Res y el Consejo de la Industria Pesquera y Acuicultura.

Se autorizó al Secretario de Agricultura a transferir los programas antes mencionados, todos relacionados a la Industria Agropecuaria de Puerto Rico, bajo la jurisdicción de la Oficina de Ordenamiento de la Industria Agropecuaria. Para viabilizar el proyecto de desarrollo económico contemplado en la ley, cada una de las industrias que quedara adscrita a dicha oficina crearía un fondo dirigido a promover la producción y comercialización de sus productos, encomienda que se lograría mediante la transferencia de sus correspondientes asignaciones presupuestarias a ese nuevo fondo. Arts. 7 y 12 (5 L.P.R.A. secs. 3056 y 3061 (2005)). La Junta Administrativa del Fondo constituida en virtud de la Ley 95 pasaría a ser el cuerpo directivo del programa equivalente bajo la Oficina de Ordenamiento de la Industria Agropecuaria, una vez ésta fuese reestructurada conforme las disposiciones de la Ley 238. Art. 13 (5 L.P.R.A. sec. 3051 n. (2005)).

**IV**

Como fundamento para dejar sin efecto la determinación recurrida, Northwestern aduce un total de cuatro (4) errores alegadamente cometidos por el foro apelativo intermedio. Por las razones que procedemos a enunciar más adelante, atenderemos únicamente el primer y el tercer error que transcribiéramos anteriormente, según

esbozados por Northwestern en su alegato.[3]   Debido a que ambos señalamientos están íntimamente relacionados entre sí, los discutiremos de manera integrada.

La peticionaria cuestionó por primera vez la validez de la Ley 95 a la luz de los principios rectores que emanan de la Cláusula de Comercio de la Constitución Federal durante el trámite apelativo.   No se presentó este argumento como parte de los procedimientos en instancia, por lo que el Tribunal de Apelaciones rehusó considerar sus méritos.[4]

Aunque como regla general un tribunal apelativo no debe entrar a resolver cuestiones no planteadas a nivel de instancia, repetidamente hemos reafirmado el principio rector de que en miras de impartir justicia, un "tribunal apelativo tiene la facultad inherente de considerar y resolver errores patentes que surjan de un recurso aun cuando éstos no hayan sido presentados por las partes." S.L.G. Flores-Jiménez v. Colberg, 173 D.P.R. 843, 851 (2008) (citando a Hernández v. Espinosa, 145 D.P.R. 248, 264 (1998)); Hons. Castro, Cabán v. Depto. de Justicia, 153 D.P.R. 302, 312 (2001).

Ya desde Piovanetti v. Vivaldi, 80 D.P.R. 108, 121-122 (1957), reconocimos que la norma de rechazar

---

[3]    En el segundo error se cuestiona la constitucionalidad de la Ley 95 a la luz de los derechos a la libre asociación y expresión, mientras que en el cuarto señalamiento la peticionaria aduce que es ilegal que los dineros que le son requeridos mediante la Ley 95 pasen al fondo creado por la Ley 238 para uso exclusivo de los intereses de la industria de carne local.

[4]    En su alegato, el Gobierno se limitó a objetar nuestra consideración de dicho planteamiento, sin entrar a discutir los méritos del mismo.

cuestiones no planteadas o resueltas por los tribunales inferiores no es un dogma inquebrantable. Véase, además, Granados v. Rodríguez Estrada I, 124 D.P.R. 1, 46-47 (1989); Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691, 694-695 (1983); Santiago Cruz v. Hernández Andino, 91 D.P.R. 709, 711 (1965).

Según hemos explicado, dicha máxima restrictiva debe aplicarse con gran cautela, apartándose de los rigores e inflexibilidad de una regla automática. Santiago Cruz v. Hernández Andino, *supra,* a la pág. 711; Piovanetti v. Vivaldi, *supra,* a la pág. 122.

> De ahí que si la cuestión planteada por primera vez en apelación no suscita ninguna controversia de hecho, y por el contrario, sólo envuelve una cuestión de derecho cuya solución basta para dictar en apelación un fallo final, no podríamos negarnos a considerarla sin faltar a nuestro deber de impartir justicia y de hallar en cada litigio la verdad.

Piovanetti v. Vivaldi, *supra,* a la pág. 122.

La controversia suscitada en este recurso gira en torno a un asunto de gran trascendencia para nuestro ordenamiento, lo que nos induce a manifestarnos finalmente de manera directa y contundente sobre la temática de la Cláusula de Comercio y sus efectos en nuestra jurisdicción. Consideramos apropiado este caso para dilucidar dicha problemática, ya que no se encuentran presentes hechos en controversia relacionados con este planteamiento en particular, lo que limita nuestra labor a una de estricto derecho.

**V**

**CLÁUSULA DE COMERCIO EN SU ESTADO DURMIENTE**

Previo a dilucidar el asunto medular de si aplica a Puerto Rico la Cláusula de Comercio de la Constitución Federal en su versión durmiente o negativa, juzgamos pertinente precisar en qué consiste la misma.

La potestad del Congreso de los Estados Unidos (Congreso) para regular el comercio entre los estados, así como con naciones extranjeras, aparece conferida taxativamente en el Artículo I, Sección 8 de la Constitución Federal, L.P.R.A., Tomo 1.[5] Dicha disposición constitucional, conocida comúnmente como la Cláusula de Comercio, ha servido a través de los años como fuente amplia del poder reglamentario de la rama legislativa federal. L. H. Tribe, <u>American Constitutional Law</u>, 3ra Ed., Nueva York, Foundation Press, 2000, T. 1, págs. 807-808; E. Chemerinsky, <u>Constitutional Law, Principles and Policies</u>, 4ta Ed., Nueva York, Ed. Aspen Publishers, 2010, págs. 238-239.

A pesar de que la Constitución Federal no establece restricción alguna a la injerencia de los estados en el comercio interestatal, hace ya más de un siglo que el Tribunal Supremo de los Estados Unidos (Tribunal Supremo Federal) decretó que, en vista de la facultad congresional

---

específicamente adscrita, existen unas prohibiciones implícitas al poder de los estados en este renglón. Cooley v. Bd. of Wardens, 53 U.S. 299 (1851).

Esta limitación regulatoria se ha denominado como el aspecto "durmiente" o "negativo" de la Cláusula de Comercio y surge como contraparte al poder que le ha sido conferido expresamente al Congreso a través de dicho precepto constitucional. Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 337-338 (2008); United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007); Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n, 525 U.S. 429, 433 (2005).

Por su parte, James Madison, considerado como el padre de la Constitución Federal, consideró el aspecto negativo de la Cláusula de Comercio como el más importante. A estos efectos, indicó que la Cláusula de Comercio se redactó como medida para atender el abuso de poder ejercitado por los estados al imponer cargas tarifarias sobre los productos provenientes de los otros estados. Explicó que, más que concederle autoridad al Gobierno central, tenía como fin prevenir la injusticia entre los propios estados. West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 193 n. 9 (1994).

**A.**

A través de los años el Tribunal Supremo Federal ha utilizado diversas teorías para apoyar el desarrollo de la

doctrina de la Cláusula de Comercio en su aspecto durmiente.

Inicialmente, ésta surge como medida para atender los efectos económicos adversos en el colectivo de la nación norteamericana sobrevenidos como resultado de los intentos de proteccionismo económico de los estados individuales. Es decir, pretendía desalentar aquellas disposiciones reglamentarias dirigidas a beneficiar los intereses económicos dentro del estado que imponían cargas o restricciones a los competidores de fuera de sus lindes geográficos. A tales efectos, se destaca la importancia de operar conjuntamente como una nación, a la vez que se le reconoce cierto grado de autonomía fiscal a sus componentes. En otras palabras, en términos económicos los Estados Unidos son una sola nación. "[The Constitution] was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935). Véase, además, Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n, *supra*, a la pág. 433; West Lynn Creamery, Inc. v. Healy, *supra*, a la pág. 206. "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separate economic units." H.P.

Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537-538
(1949).

Los efectos perjudiciales que la doctrina quiere
evitar han sido denominados por el Tribunal Supremo
Federal como "aislamiento" o "balkinización", y las
medidas impugnadas han sido analizadas a la luz de la
necesidad apremiante de alcanzar el beneficio común sobre
el de cada estado individual.  "The point is to effectuate
the Framers' purpose to prevent a State from retreating
into the economic isolation that had plagued relations
among the Colonies and later among the States under the
Articles of Confederation."  Dep't of Revenue of Ky. v.
Davis, *supra*, a la pág. 338 (citas, comillas y corchetes
omitidos).  Véase, además, West Lynn Creamery, Inc. v.
Healy, *supra*, a la pág. 202.

> This mandate reflects a central concern of the
> Framers that was an immediate reason for calling
> the Constitutional Convention: the conviction
> that in order to succeed, the new Union would
> have to avoid the tendencies toward economic
> Balkanization that had plagued relations among
> the Colonies and later among the States under
> the Articles of Confederation.

Granholm v. Heald, 544 U.S. 460, 472 (2005) (cita,
comillas y corchetes omitidos); Dep't of Revenue of Ky. v.
Davis, *supra*, a las págs. 337-338; Wardair Canada, Inc. v.
Fla. Dept. of Revenue, 477 U.S. 1, 7 (1986).

Parte de lo que se persigue al proscribir el
proteccionismo es evitar represalias de los otros estados
generadas en respuesta al trato desigual brindado a sus

residentes por un estado hermano, lo cual socavaría los designios del esquema constitucional federal. "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994).

Igualmente, se protege la libertad de movimiento de los bienes entre los estados y los demás componentes de la Nación Americana salvaguardando el libre acceso y competencia de los mercados constituidos por estos.

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

H.P. Hood & Sons, Inc. v. Du Mond, *supra*, a la pág. 539; West Lynn Creamery, Inc. v. Healy, *supra*, a las págs. 206-207.

Por otro lado, se le ha permitido a los estados imponer medidas no discriminatorias siempre y cuando éstas sean aplicadas de forma neutral aunque acarreen algún efecto adverso sobre el comercio interestatal. Ello, en parte, por entender que los intereses afectados dentro del

estado operan como salvaguarda contra el posible abuso legislativo ejercitado hacia los residentes de otros estados. West Lynn Creamery, Inc. v. Healy, *supra*, a la pág. 200.

Cabe notar que las restricciones concomitantes a la Cláusula de Comercio no son de aplicación cuando es el propio estado, en calidad de partícipe en el mercado y no como ente regulador, quien ejercita esta facultad a favor de sus propios ciudadanos. Bajo su poder de razón de estado ("police power"), los gobiernos tienen la responsabilidad de proteger la salud, seguridad y el bienestar de sus ciudadanos. Es por ello que, tradicionalmente, gozan de gran discreción para legislar sobre asuntos relacionados con estas áreas de interés.

> [A]n exception covers States that go beyond regulation and themselves participate in the market so as to exercise the right to favor their own citizens over others. This market-participant exception reflects a basic distinction between States as market participants and as market regulators…. When a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause.

Dep't of Revenue of Ky. v. Davis, *supra*, a la pág. 339 (citas, comillas y corchetes omitidos).

## VI

### A.

De entrada debemos resolver si la Cláusula de Comercio en su estado durmiente es de aplicación a Puerto Rico. Como sabemos, Puerto Rico pasó a formar parte del

esquema constitucional de Estados Unidos como resultado de la Guerra Hispanoamericana. Mediante el Tratado de París de 1898, la soberanía de Puerto Rico fue cedida a los Estados Unidos, Art. II, Tratado de París, L.P.R.A., Tomo 1, y se estableció que los derechos de los habitantes de la Isla serían definidos por el Congreso. Íd. Art. IX. De suerte que desde inicios de nuestra relación con los Estados Unidos, la manera en la cual la Constitución Federal aplicaría a Puerto Rico fue objeto de intensos debates. Véase J. J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis S.A., 2009, págs. 409-410.

A final de cuentas, le tocó al Tribunal Supremo Federal resolver de qué manera aplicaría la Constitución Federal a los nuevos territorios adquiridos a finales del Siglo XIX. Mediante los llamados Casos Insulares, el Tribunal Supremo Federal decidió que la Constitución no aplicaba en su totalidad ex proprio vigore a todos los territorios. Downes v. Bidwell, 182 U.S. 244 (1901). Sólo aquellos territorios que hubieran sido "incorporados" a Estados Unidos estarían sujetos en su totalidad a las disposiciones de la Constitución Federal. En el caso de Puerto Rico, mediante opinión dividida, se decidió que este era un territorio no incorporado al cual sólo le aplicarían las cláusulas de naturaleza fundamental de la Constitución Federal. Íd. a la pág. 291.

Así las cosas, el Tribunal Supremo Federal ha ido paulatinamente estableciendo cuáles cláusulas de la Constitución Federal son de naturaleza fundamental y, por ende, de aplicación a Puerto Rico. Así, se ha resuelto que es de aplicación a la Isla la protección a la libertad de expresión de la Primera Enmienda, Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S. 328 (1986), la protección contra registros y allanamientos irrazonables, Torres v. Puerto Rico, 442 U.S. 465 (1979), la garantía a un debido proceso de ley, Calero-Toledo v. Pearson Yacht, 416 U.S. 663 (1974), la garantía de igual protección de las leyes, Examining Board v. Flores de Otero, 426 U.S. 572 (1976), y la cláusula de suspensión del *hábeas corpus*, Boumediene v. Bush, 553 U.S. 723 (2008).

En cuanto a la Cláusula de Comercio Interestatal, inicialmente rechazamos la injerencia de la Cláusula de Comercio en nuestro ordenamiento por entender que la relación de Puerto Rico con los Estados Unidos estaba cimentada en la Cláusula Territorial de la Constitución Federal.[6] Siguiendo esta línea de pensamiento, concluimos que "contrario al efecto que tiene [la Cláusula de Comercio] sobre el poder de las legislaturas estatales, [dicha disposición] no restringe el poder de la

---

[6]     El Artículo IV, Sec. 3, Cl. 2 de la Const. de los EE.UU., provee lo siguiente: "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State."

legislatura insular…". <u>Ballester Hnos. v. Tribunal de Contribuciones</u>, 66 D.P.R. 560, 566-567 (1946).

Posteriormente, en <u>R.C.A. v. Gobierno de la Capital</u>, 91 D.P.R. 416 (1964), sostuvimos que la Cláusula de Comercio no aplicaba a Puerto Rico *ex proprio vigore*. En ese momento, a mediados del siglo pasado, apuntamos que luego de la cesión de Puerto Rico a los Estados Unidos mediante el Tratado de París, a diferencia de otras comunidades, no se hicieron extensivas en su totalidad las disposiciones constitucionales a la Isla. Mencionamos también que expresamente se excluyeron de aplicación a Puerto Rico la Ley sobre Comercio Interestatal, así como sus enmiendas, al igual que la Ley para Regular el Comercio, aprobada el 4 de febrero de 1887 y las leyes enmendatorias de la misma.[7] Añadimos que tampoco se hicieron extensivas las leyes de rentas internas federales.[8]

Subsiguientemente, aplicamos lo señalado en <u>RCA v. Gobierno de la Capital</u>, *supra*, en otra jurisprudencia. Véase <u>South P.R. Sugar Corp. v. Com. Servicio Pub.</u>, 93 D.P.R. 12, 15-16 (1966) (donde resolvimos que de todos modos la medida impugnada no constituía "una carga irrazonable, discriminatoria u onerosa sobre el comercio interestatal…"). Mientras, en <u>M. & B. S., Inc. v. Depto.</u>

---

[7]    Actualmente consignado en el Artículo 38 de la Ley de Relaciones Federales con Puerto Rico (Ley de Relaciones Federales), 1 L.P.R.A. sec. 38 (2008).

[8]    Art. 9, Ley de Relaciones Federales, 1 L.P.R.A. sec. 9 (2008).

de Agricultura, 118 D.P.R. 319 (1987), sostuvimos la validez de la reglamentación de cierta leche importada conforme a la normativa federal sobre la Cláusula de Comercio, haciendo la observación de que dicho resultado hacía innecesario resolver su aplicabilidad a Puerto Rico.

Sin embargo, nuestra decisión en R.C.A. v. Gobierno de la Capital, *supra*, comenzó a cuestionarse posteriormente por varios miembros de este Tribunal. Así, por ejemplo, en E.L.A. v. Supermercados Amigo, 170 D.P.R. 459, 460-470 (2007) (Sentencia), el Juez Asociado señor Efraín Rivera Pérez emitió una Opinión Disidente en la cual cuestionó por qué el Tribunal se negó en esa ocasión a revisar la decisión de R.C.A. v. Gobierno de la Capital, *supra*. Íd. a las págs. 460-461. Además, expresó el Juez Asociado señor Rivera Pérez que, a su entender, la Cláusula de Comercio en su estado durmiente se extendía a Puerto Rico a través de la Ley de Relaciones Federales, *supra*. Íd. a la pág. 467.

Posteriormente, el Juez Asociado señor Francisco Rebollo López se insertó al debate sobre la validez de nuestra decisión en R.C.A. v. Gobierno de la Capital, *supra*. En su Opinión de Conformidad en Asoc. Importadores de Cerveza v. E.L.A., 171 D.P.R. 140, 143-172 (2007) (Sentencia) expresó el Juez Asociado señor Rebollo López que:

> [D]adas las circunstancias particulares de nuestra relación con Estados Unidos, *los argumentos a favor de la aplicación a Puerto*

*Rico de la cláusula de comercio, en su estado durmiente, son más persuasivos que los argumentos en contra….*

*....*

*[E]ntendemos que la doctrina relativa al estado durmiente de la cláusula de comercio de la Constitución de Estados Unidos aplica al Estado Libre Asociado de Puerto Rico, según lo ha desglosado el Tribunal Supremo federal.*

Íd. a las págs. 159, 161 (énfasis en original).

**B.**

A nivel federal la discusión sobre este tema, aunque abundante, es diametralmente opuesta a lo que decidimos en RCA v. Gobierno de la Capital, *supra*.

Inicialmente, en Lugo v. Suazo, 59 F.2d 386, 390 (1er Cir. 1932), se dictaminó sin discusión alguna que la Cláusula de Comercio no era extensiva a Puerto Rico. Luego, en Sancho v. Bacardí Corp. of Am., 109 F.2d 57, 62-63 (1er Cir. 1940), se indicó que dicha disposición constitucional resultaba inaplicable ya que Puerto Rico no era un estado de la Unión, sino que la facultad legislativa sobre la Isla residía en la Cláusula Territorial. Finalmente, en Buscaglia v. Ballester, 162 F.2d 805, 806-807 (1er Cir. 1947), se rechazó la aplicación a Puerto Rico de la Cláusula de Comercio tanto en su versión activa como durmiente por no ser éste un estado sino un territorio organizado no incorporado de los Estados Unidos.

No obstante, en Trailer Marine Transp. Corp. v. Rivera Vázquez, 977 F.2d 1 (1er Cir. 1992), se revocó el

dictamen de <u>Buscaglia v. Ballester</u>, *supra*.  El Tribunal de Apelaciones federal para el Primer Circuito determinó que las relaciones constitucionales entre Estados Unidos y Puerto Rico habían evolucionado al punto de asemejarse a un estado con su propio sistema republicano de gobierno, lo que lo colocaba dentro del ámbito de la Cláusula de Comercio durmiente.

> We think that the force of the reasoning in *Buscaglia* has been sapped by events since that decision.  However the matter may have appeared in 1947, certainly since 1952 Puerto Rico has had sufficient effective autonomy to classify it as something more than the mere agent of Congress and thus bring it within the dormant Commerce Clause doctrine.

<u>Trailer Marine Transp. Corp. v. Rivera Vázquez</u>, *supra,* a la pág. 9.

El tribunal indicó que el propósito de la legislación federal del 1950 y 1952 atinente a Puerto Rico fue el concederle a la Isla un grado de autonomía e independencia normalmente asociada con los estados de la Unión.  <u>Trailer Marine Transp. Corp. v. Rivera Vázquez</u>, *supra,* a las págs. 8-9.  Asimismo, razonó el referido foro que los propósitos que alientan la doctrina de la Cláusula de Comercio durmiente, tales como la integración económica y evitar la interferencia con el flujo del comercio nacional, son de igual aplicación a la relación de Puerto Rico con los Estados Unidos.

La doctrina expuesta en <u>Trailer Marine Transp. Corp. v. Rivera Vázquez</u>, *supra*, sigue vigente y es aplicada

consistentemente por los tribunales federales. Véanse _Antilles Cement Corp. v. Acevedo Vilá_, 408 F.3d 41 (1er Cir. 2005); _Walgreen Co. v. Rullán_, 405 F.3d 50 (1er Cir. 2005); _Starlight Sugar, Inc. v. Soto_, 253 F.3d 137 (1er Cir. 2001).

## C.

La discusión sobre este tema se ha extendido entre ex miembros de esta Curia y profesores de derecho quienes, a pesar de utilizar teorías diferentes, en su mayoría coinciden en que existen limitaciones al poder reglamentario de Puerto Rico en materia del comercio interestatal. Opina el otrora Juez Asociado señor Raúl Serrano Geyls:

> En lo que toca a Puerto Rico, aunque ha habido intensos debates sobre la aplicación de la Cláusula de Comercio a nuestro país… no hay duda de que, independientemente de las justificaciones teóricas, las normas establecidas por el Tribunal Supremo federal para los estados rigen en Puerto Rico por razón de que el Congreso desde 1900 incluyó a la Isla en el sistema de comercio estadounidense.

R. Serrano Geyls, _Derecho Constitucional de Estados Unidos y Puerto Rico_, Puerto Rico, Ramallo Bros. Printing, 1986, Vol. 1, pág. 341.

En su libro de reciente publicación, el profesor José Julián Álvarez González cuestiona el que Puerto Rico tenga la capacidad de promulgar reglamentaciones vedadas a los estados, lo que equivaldría a reconocerle más autonomía que la que éstos poseen. A esos efectos ha expresado "[q]ue la _ley_ federal de comercio interestatal no aplique

a Puerto Rico, por voluntad del Congreso, no significa necesariamente que tampoco apliquen las limitaciones que surgen de la propia cláusula de comercio." J. J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis S. A., 2009, pág. 574 (énfasis en original).

Asimismo, el profesor Álvarez González también ha indicado lo siguiente:

> La doctrina de incorporación territorial se inventó para permitir *al gobierno federal* tratar con Puerto Rico libre de muchas de las ataduras que la Constitución federal impone a ese gobierno. De ello no se infiere – ni lógicamente ni de forma alguna – que esa doctrina sirva o pueda servir para liberar *al gobierno de Puerto Rico* frente al poder federal.

Álvarez González, op. cit., a la pág. 575 (énfasis en original).

Por su parte, el profesor David M. Helfeld coincide con la premisa de que no se le puede permitir a Puerto Rico interferir con el comercio interestatal o profesar el aislamiento económico cuando dicha conducta le está prohibida a los estados. Al mismo tiempo, hace mención de las limitaciones implantadas por la Sección 3 de la Ley de Relaciones Federales que prohíben tanto la imposición de tarifas a las exportaciones a Estados Unidos como impuestos discriminatorios a artículos importados de los Estados Unidos o el extranjero frente a aquellos producidos o manufacturados en la Isla. David Helfeld, How

Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?, 39 Rev. Jur. U.P.R. 169, 190 (1970).

### D.

No cabe duda que a través de los años la relación de Puerto Rico y los Estados Unidos ha ido evolucionando y se ha fortalecido de diversas maneras. En múltiples ocasiones, el Tribunal Supremo Federal ha expresado que Puerto Rico debe ser tratado como si fuera un estado para propósitos constitucionales o de aplicación estatutaria.

Así, por ejemplo, el Tribunal expresó en Rodríguez v. Popular Democratic Party, 457 U.S. 1 (1982), que Puerto Rico, al igual que los estados federados, puede decidir la manera en que llena vacantes en las cámaras legislativas. Íd. a la pág. 8. Por su parte, en Alfred L. Snap & Son, Inc. v. Puerto Rico, 458 U.S. 592 (1982), se decidió que Puerto Rico puede ejercer su poder de parens patrie para asegurar que los beneficios del sistema federal no sean negados a sus ciudadanos como si fuera un estado.

A base de esto, nos parecen acertadas las expresiones de la ex Jueza Asociada del Tribunal Supremo Federal Sandra Day O'Connor en United States v. Laboy-Torres, 553 F.3d 715 (3er Cir. 2009):

> It is thus not surprising that "although Puerto Rico is not a state in the federal Union, 'it … seems to have become a State within a common and accepted meaning of the word.'"…. Consistent with this common and accepted understanding, Congress frequently uses the term "State" to refer also to Puerto Rico…. More

significantly, when Congress fails explicitly to refer to Puerto Rico, courts must nonetheless inquire whether it intended to do so…. **Conducting this inquiry, courts routinely conclude that Congress intended to include Puerto Rico even when a statute is silent on that front….**

Íd. a las págs. 721-722 (citas internas omitidas y énfasis suplido).

Amparados en que Puerto Rico es considerado por la jurisprudencia federal en la mayoría de las ocasiones como si fuese un estado de la Unión federal, pasamos a considerar el asunto medular de esta Opinión: ¿Aplica la Cláusula de Comercio en su estado durmiente a Puerto Rico?

Como ya discutimos, la Cláusula de Comercio es una de las más eminentes delegaciones de poder que se le hizo al Congreso de los Estados Unidos. Su vertiente negativa o durmiente representa la herramienta principal del esquema constitucional para prohibir la balkinización entre los componentes de la federación. Por ende, y ante la cada vez mayor integración de Puerto Rico al sistema federal, la justificación para la aplicación de esa Cláusula a la Isla es sencilla.

Si en términos prácticos Puerto Rico se asemeja a un estado, le deben ser de aplicación igualmente las limitaciones que recaen sobre estos en virtud de la Cláusula de Comercio. Resultaría inconcebible la posibilidad de que exista una jurisdicción que sea considerada como un estado en los Estados Unidos que no esté sujeta a la Cláusula que representa la herramienta de

integración económica y nacional más importante de la Constitución Federal. Los efectos desfavorables al federalismo que la Cláusula de Comercio en su estado durmiente está dirigida a evitar también sirven de fundamento para la implementación del aspecto durmiente o negativo de la Cláusula de Comercio a Puerto Rico.

Aunque nuestra Constitución provee para la imposición y el cobro de contribuciones por parte del Estado, según sea dispuesto por la Asamblea Legislativa,[9] y dicha facultad se ha interpretado como una amplia y abarcadora, Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548 (2001); Continental Ins. Co. v. Srio. de Hacienda, 154 D.P.R. 146 (2001), su capacidad tributaria no es ilimitada. El desempeño de su papel como ente fiscal debe ser ejercitado de manera cónsona con pautas de naturaleza constitucional, así como aquellas otras restricciones que le sean de aplicación. Sobre este particular, la Ley de Relaciones Federales en su Artículo 3 dispone que no se hará distinción entre los artículos importados de Estados Unidos y aquellos similares producidos o manufacturados en Puerto Rico. Art. 3, Ley de Relaciones Federales, L.P.R.A., Tomo 1, Sec. 3 (2008).

De otra parte, las enmiendas a nuestra Constitución están circunscritas a que éstas sean "compatible[s] con la resolución decretada por el Congreso de los Estados Unidos aprobando [la] Constitución con las disposiciones

---

[9]    Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1 (2008).

aplicables de la Constitución de los Estados Unidos, con la Ley de Relaciones Federales con Puerto Rico y con la Ley Pública 600 … adoptada con el carácter de un convenio". Art. VII, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1 (2008).

El propósito de esta condición se expuso de la siguiente manera:

> Applicable provisions of the United States Constitution and the Federal Relations Act will have the same effect as the Constitution of the United States has with respect to State constitutions or State laws. United States laws not locally inapplicable will have equal force and effect in Puerto Rico as throughout the States except as otherwise provided in the Federal Relations Act. Any act of the Puerto Rican Legislature in conflict with … the Constitution of the United States or United States laws not locally inapplicable would be null and void.

> Within this framework, the people of Puerto Rico will exercise self-government. As regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union.

Examining Bd. of Eng'rs v. Flores de Otero, *supra*, a las págs. 593-594 n. 25.

Podemos colegir, por lo tanto, que el esquema normativo provisto para nuestra relación con los Estados Unidos equipara el alcance de la Constitución Federal y la Ley de Relaciones Federales en nuestro ordenamiento a la preeminencia de la Constitución Federal sobre las constituciones y disposiciones estatutarias de los estados.

Por otro lado, y además de la Cláusula de Comercio, queda claro que el Congreso quería prohibir que Puerto Rico discriminara contra artículos importados. Esta voluntad quedó categóricamente plasmada en la Sección 3 de la Ley de Relaciones Federales. Art. 3, Ley de Relaciones Federales, L.P.R.A., Tomo 1, Sec. 3 (2008). Por ende, aun si sostuviéramos que no es de aplicación *ex proprio vigore* la Cláusula de Comercio en su estado durmiente a Puerto Rico, la propia Ley de Relaciones Federales le prohíbe a la Isla discriminar contra artículos importados, por lo cual el efecto sería el mismo: la Isla no puede levantar barreras de aislamiento económico con el resto de la Nación.

Es por eso que no deben sorprendernos los serios cuestionamientos que se han levantando en contra de nuestra determinación en R.C.A v. Gobierno de la Capital, *supra*. Como vimos, en esa ocasión decidimos que la Cláusula de Comercio en su estado durmiente no era de aplicación a Puerto Rico, por lo cual la Isla podía poner en vigor medidas económicas que le estarían vedadas a los estados. Como muy bien expone el Prof. Álvarez González:

> [L]a sola enunciación de esa consecuencia demuestra su imposibilidad. Resulta increíble que el Congreso en 1952 haya estado dispuesto a reconocerle a Puerto Rico un poder del que carecen los estados y que es tan contrario a la cada vez mayor integración económica en Estados Unidos.

J. J. Álvarez González, op. cit., pág. 574.

Coincidimos con las expresiones de éste. El razonamiento de R.C.A v. Gobierno de la Capital, *supra*, sencillamente no va acorde con la realidad de la relación constitucional de Puerto Rico y los Estados Unidos. **Dicho caso no tiene espacio en nuestra jurisprudencia y queda hoy revocado**.

Conforme a lo anteriormente expuesto, **hoy decidimos que las limitaciones inherentes a la Cláusula de Comercio interestatal en su estado durmiente son de aplicación a Puerto Rico *ex proprio vigore***. Por ende, al igual que los estados de la federación, **Puerto Rico está constitucionalmente vedado de imponer medidas económicas que afecten negativamente el comercio interestatal**.

## VII

Una vez resuelto el asunto preliminar de la aplicación de los preceptos que abarca la Cláusula de Comercio en su modalidad durmiente a Puerto Rico, nos toca atender si la legislación impugnada en efecto los contraviene.

Reiteradamente hemos reconocido el principio de que todo estatuto es y se presume constitucional hasta que se determine lo contrario. Aut. Carreteras v. 8,554.741 m/c I, 172 D.P.R. 278, 298 (2007); Rexach v. Ramírez, 162 D.P.R. 130, 148 (2004); Cerame-Vivas v. Srio. de Salud, 99 D.P.R. 45, 51 (1970).

Al ejercer nuestra función judicial encauzada a auscultar la validez de un estatuto lo hacemos conscientes

de la deferencia exigida al ejercicio del Poder Legislativo acorde su mandato constitucional, conforme los roles adscritos a cada una de las ramas gubernamentales bajo el esquema de separación de poderes allí prescrito. Se busca, por lo tanto, lograr aquellas interpretaciones que sostengan su validez ante los ataques por alegada deficiencia constitucional. Aut. Carreteras v. 8,554.741 m/c I, *supra*, a la pág. 298; Rexach v. Ramírez Vélez, *supra*, a la pág. 149; Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990).

Una ley puede ser declarada inconstitucional tanto de su faz como en su aplicación. Aut. Carreteras v. 8,554.741 m/c I, *supra*, a la pág. 298; Rexach v. Ramírez Vélez, *supra*, a la pág. 148; Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144 D.P.R. 1, 22 (1997).

Como parte del proceso de evaluar la constitucionalidad de una ley bajo la óptica de su faz, es menester considerar si de su propio texto surge el vicio que la torna inconstitucional. De otra parte, para determinar si el estatuto vulnera derechos constitucionales en su aplicación es preciso analizar el contexto en el cual la medida impugnada ha sido empleada para determinar si ha tenido el efecto de infringir alguna disposición constitucional. Rexach v. Ramírez Vélez, *supra*, a la pág. 148; Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, *supra*, a la pág. 23.

A pesar del tiempo transcurrido desde su génesis, la doctrina de la Cláusula de Comercio durmiente no resulta de fácil aplicación. Así lo reconoció el Juez Asociado del Tribunal Supremo Federal Clarence Thomas quien, luego de detallar los fundamentos judiciales utilizados a través de los años para validarla, consignó la siguiente observación: "[D]espite more than 100 years of negative Commerce Clause doctrine, there is no principled way to decide this case under current law." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, a la pág. 353 (Opinión Concurrente del Juez Thomas).

Igualmente, por voz del Tribunal Supremo Federal se ha descrito la jurisprudencia en esta área como "terreno no firme" donde las decisiones tomadas equivalen a reacciones judiciales a situaciones particulares. "[W]e have described our own decisions in this area as a 'quagmire' of judicial responses to specific state tax measures…". Am. Trucking Ass'n, Inc. v. Scheiner, 483 U.S. 266, 280 (1987).

La fluctuación de las bases sobre las cuales se asienta la doctrina desarrollada en torno a la Cláusula de Comercio en su aspecto negativo ha ocasionado incertidumbre. A la vez, ha engendrado detractores dentro del seno del propio Tribunal Supremo Federal. A estos efectos, ha sido severamente criticada por varios de sus miembros por entender estos que según la misma ha sido

expandida se les coloca en una posición injustificada de intervención judicial.[10]

Queda claro, sin embargo, que el análisis a utilizarse bajo los parámetros de la Cláusula de Comercio en su estado durmiente rechaza la formalidad y en su lugar exige un examen individualizado caso a caso con especial atención a los propósitos y efectos del precepto en cuestión. West Lynn Creamery, Inc. v. Healy, *supra*, a la pág. 201.

Las leyes pueden resultar discriminatorias de su faz, a base del propósito que persiguen o por su efecto en el comercio interestatal.[11] Cuando un estatuto claramente discrimina de su faz contra el comercio interestatal o cuando tiene el propósito y/o efecto práctico de favorecer

---

[10]     Explica el Juez Scalia que no existe base histórica para interpretar dicha disposición constitucional más allá de la autorización al Congreso para reglamentar el comercio.  Manifiesta que él estaría dispuesto a acatar, conforme el principio de *stare decisis*, decisiones anteriores sobre esta doctrina cuando la disposición estatal discrimina de su faz contra el comercio interestatal o estén en juego leyes idénticas a estatutos previamente declarados inconstitucionales.  Véase United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 348 (2007) (Opinión Concurrente en parte del Juez Scalia) (resumiendo su posición al respecto según expuesta en casos anteriores).

Ⅰ El Juez Thomas, por su parte, formula el debate de la siguiente manera: "[A]pplication of the Commerce Clause turns solely on policy considerations, not on the Constitution.  Because this Court has no policy role in regulating interstate commerce, I would discard the Court's negative Commerce Clause jurisprudence."  Véase United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, a la pág. 349 (Opinión Concurrente del Juez Thomas) (haciendo un recuento de sus expresiones similares previamente vertidas sobre este particular).

[11]     Para una discusión sobre la tendencia del Tribunal Supremo Federal a evaluar los ataques a legislación federal promulgada dentro del ámbito de poder de la Cláusula de Comercio utilizado bajo el marco revisor de la faz del estatuto en lugar del método tradicional de medir su validez según su aplicación, véase D. L. Franklin, Facial Challenges, Legislative Purpose, and the Commerce Clause, 92 Iowa L. Rev. 41 (noviembre 2006); N. Stewart, Note, Turning the Commerce Clause Challenge "on its Face": Why Federal Commerce Clause Statutes Demand Facial Challenges, 55 Case Western Reserve Law Rev. 161 (otoño 2004); J. S. Baker, Jr., Jurisdictional and Separation of Powers Strategies to Limit the Expansion of Federal Crimes, 54 Am. U. L. Rev. 545 (febrero 2005).

los intereses locales sobre los de fuera del estado, como regla general, se considerará inválido *per se* y corresponde al ente regulador defenderlo presentando evidencia de que éste sirve un propósito legítimo el cual no puede ser atendido por medios alternos razonables no discriminatorios.

> Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against interstate commerce. A discriminatory law is "virtually *per se* invalid" and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.

Dept. of Revenue of Kentucky v. Davis, *supra*, a la pág. 338 (citas y comillas omitidas). Véase, además, Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 353 (1977).

De otra parte, cuando la disposición está redactada en términos neutrales y su aplicación no resulta parcializada, se presume lícita. Su legitimidad, a la luz de la Cláusula de Comercio, se determinará en función al balance entre la intrusión que ésta representa al comercio interestatal frente a los beneficios que genera. En estos casos, corresponde a la parte que la impugna establecer que la interferencia ocasionada al comercio interestatal es excesiva. Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

> [The *Pike* test is] reserved for laws directed to legitimate local concerns, with effects upon interstate commerce that are only incidental. Under the *Pike* test, we will uphold a nondiscriminatory statute… unless the burden imposed on interstate commerce is clearly

excessive in relation to the putative local benefits.

United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, a la pág. 346 (citas, comillas y corchetes omitidos). Véase, además, Am. Trucking Ass'n., Inc. v. Mich. Pub. Serv. Comm'n, *supra*, a la pág. 433; Dep't of Revenue of Ky. v. Davis, *supra*, a la pág. 339.

Como primer paso al análisis correspondiente bajo el aspecto durmiente de la Cláusula de Comercio debe preguntarse si la reglamentación en controversia discrimina contra el comercio interestatal. Dep't of Revenue of Ky. v. Davis, *supra*, a la pág. 338; United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, a la pág. 338; Am. Trucking Ass'n, Inc. v. Mich. Public Serv. Comm'n, *supra*, a la pág. 433.

Una de las maneras en que se puede interferir con el comercio interestatal es a través de cargas económicas al flujo de las transacciones entre los estados. Con el propósito de indagar la legalidad de los impuestos refrendados por los estados a este tipo de actividad se han establecido una serie de criterios que han de servir al tribunal como guía en su gestión interpretativa. Así pues, se considerará una medida tributaria válida si cumple con los siguientes requisitos: (1) existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la impone; (2) la contribución está distribuida o proporcionada equitativamente; (3) la

contribución en cuestión no discrimina contra el comercio interestatal, y (4) la contribución está relacionada apropiadamente con los servicios provistos por el estado. Esta doctrina, esbozada inicialmente en Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977), ha sido avalada por el Tribunal Supremo Federal en casos donde el planteamiento gira en torno al aspecto durmiente de la Cláusula de Comercio.[12] Am. Trucking Ass'n, Inc. v. Mich. Public Serv. Comm'n, *supra*, a la pág. 438; Am. Trucking Ass'n, Inc. v. Scheiner, *supra*, a la pág. 277; Wardair Canada, Inc. v. Fla. Dep't of Revenue, *supra*, a la pág. 8.

Para efectos del caso que nos ocupa, nos vemos precisados a abordar únicamente los aspectos relacionados al tercer criterio aludido anteriormente. Es decir, el aspecto de discrimen. Ello es así puesto que el planteamiento según esgrimido por la parte peticionaria en su recurso gira exclusivamente en torno al alegado propósito y motivo discriminatorio de la contribución impugnada.[13]

---

[12] La Cláusula de Comercio en su aspecto durmiente aplica igualmente a medidas protectoras que interfieren con el comercio extranjero. La validez de contribuciones a productos del extranjero se mide a base de los cuatro factores enunciados en Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977), y dos adicionales. Éstos son: (1) que no exista el riesgo de imposición de contribuciones múltiples a nivel internacional, y (2) que la contribución no impida que el gobierno federal se exprese con "una voz" al regular las relaciones comerciales con naciones extranjeras. Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434 (1979); Iberia v. Srio. de Hacienda, 135 D.P.R. 57 (1993); Gómez Hnos., Inc. v. Srio. de Hacienda, 114 D.P.R. 367 (1983).

[13] En ningún momento se cuestiona la facultad gubernamental para exigir la aportación como tampoco se impugna la fórmula dispuesta en la Ley 95 para fijar el monto de las tarifas aplicables a los importadores frente a aquellas correspondientes a la producción de carne local.

En el contexto de la Cláusula de Comercio en su acepción negativa se entiende por "discrimen" el trato desigual dispensado a los intereses económicos dentro y fuera del estado beneficiando a los primeros e imponiendo cargas a los últimos. Esta premisa ha sido articulada por el máximo foro federal de diferentes maneras.  "In this context 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, a la pág. 338; Granholm v. Heald, *supra*, a la pág. 472.  "[W]hen a law favors in-state business over out-of-state competition, rigorous scrutiny is appropriate because the law is often the product of simple economic protectionism."  United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, a la pág. 343 (cita y comillas omitidas).  "[S]tates may not impose taxes that facially discriminate against interstate business and offer commercial advantage to local enterprises…."  Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n, *supra*, a la pág. 433 (citas, comillas y corchetes omitidos); Granholm v. Heald, *supra*, a la pág. 472.  "[A] state tax that favors in-state business over out-of-state business for no other reason that the location of its business is prohibited by the Commerce Clause."  Am. Trucking Ass'n, Inc. v. Scheiner, *supra*, a la pág. 286.

Como parte del análisis requerido bajo los parámetros de la Cláusula de Comercio en su estado durmiente, se examinarán igualmente los efectos prácticos de la medida cuestionada para verificar si éstos resultan discriminatorios. "The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." West Lynn Creamery, Inc. v. Healy, *supra*, a la pág. 201 (cita y comillas omitidas).

Las tarifas protectoras que recaen exclusivamente sobre productos provenientes de otro estado sin que apliquen a mercancías similares oriundas del estado impositor constituyen el ejemplo clásico de una ley discriminatoria contra el comercio interestatal. West Lynn Creamery, Inc. v. Healy, *supra*, a la pág. 193. "This 'negative' aspect of the Commerce Clause prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.…" Íd. a la pág. 192 (cita y comillas omitidas). "Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits." Íd. a la pág. 205. "The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local

interests." C & A Carbone, Inc. v. Town of Clarkstown, *supra*, a la pág. 393.

En Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n, *supra*, se avaló la constitucionalidad de una tarifa que exigía el pago de derechos anuales impuesta a camiones de arrastre operando dentro del estado. El Tribunal Supremo Federal concluyó que la actividad en cuestión no vulneraba los cuatro factores enunciados en Complete Auto Transit, Inc. v. Brady, *supra*. Para llegar a esta conclusión el máximo foro federal utilizó los axiomas jurisprudenciales empleados para analizar si la reglamentación estatal discrimina de su faz, así como en su efecto práctico contra el comercio interestatal.

De otra parte, en West Lynn Creamery, Inc. v. Healy, *supra*, se declaró inconstitucional un impuesto a la leche vendida por comerciantes de fuera de Massachusetts a detallistas dentro del mencionado estado, el cual luego era distribuido entre los productores de leche locales. Se consideró que los pagos requeridos constituían un impuesto que ocasionaba que el precio de la leche producida fuera del estado resultara más caro. Aunque el impuesto aplicaba de igual manera a la leche proveniente de Massachusetts, el alza ocasionada en el precio del producto local se veía reducida por los subsidios concedidos únicamente a este sector. Utilizando un enfoque pragmático el Tribunal Supremo Federal dictaminó que el esquema establecido por la reglamentación

constituía esencialmente una tarifa protectora, la cual tenía tanto el propósito como el efecto de discriminar a favor de los productos estatales.

Asimismo en Am. Trucking Ass'n, Inc. v. Scheiner, *supra*, a la pág. 284, el Tribunal Supremo Federal encontró que ciertos impuestos implantados por Pennsylvania sobre vehículos de fuera del estado eran discriminatorios, ya que tenían el efecto práctico de cobrarle un impuesto por milla recorrida a los camiones provenientes de fuera del estado aproximadamente cinco veces más alto que el asignado a los locales. La opinión subrayó la importancia de indagar las consecuencias de la medida en controversia sobre el radio de acción delimitado por la Cláusula de Comercio.

Al estudiar las disposiciones de la Ley 95, a la luz de los principios rectores de las limitaciones de la Cláusula de Comercio antes reseñadas, podemos concluir que de su faz no se desprende vicio alguno.[14]

Con el fin de fundamentar su argumento de discrimen, la peticionaria inicialmente alude a los trámites llevados

---

[14] Aprovechamos para mencionar la diferencia en el enfoque utilizado al explorar la constitucionalidad de un estatuto desde la perspectiva de su faz a diferencia de en su aplicación. Al declarar inconstitucional una ley de su faz se está juzgando la función legisladora. En otras palabras, se examina si al promulgar el estatuto la Legislatura se excedió de los poderes que le fueron constitucionalmente conferidos o transgredió algún derecho individual. De otra parte, cuando se menciona la inconstitucionalidad de un estatuto en su aplicación se refiere a las acciones u omisiones del ejecutivo en la implementación del mandato legislativo. Véase Quinn Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1227 (mayo 2010).

a cabo en la Asamblea Legislativa, los cuales eventualmente culminaron con la aprobación de la Ley 95. En los mismos surgen comentarios de los legisladores así como documentos en los cuales se menciona la necesidad de legislar para proteger la industria de carne local de la amenaza económica que representan las importaciones.

No obstante, como paso inicial al ejercicio de hermenéutica nuestro ordenamiento nos dirige al texto de la ley. "Cuando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu." Art. 14 del Código Civil (31 L.P.R.A. sec. 14 (1993)). Bajo este supuesto, el texto constituye la expresión por excelencia de toda la intención legislativa. Así pues, si el mandato legislativo aparece registrado de forma clara e inequívoca, libre de ambigüedad, venimos obligados por sus términos sin necesidad de escudriñar más allá de su letra. S.L.G. Rodríguez-Rivera v. Bahía Park, 180 D.P.R. 340, 355 (2010); Rullán Rivera v. A.E.E., 179 D.P.R. 433, 444 (2010); Claro TV y Junta Regl. Tel. v. OneLink, 179 D.P.R. 177, 209-210 (2010).

Es únicamente en aquellas situaciones en que el estatuto se muestra confuso o existen dudas sobre su verdadero propósito que debemos acudir a la intención legislativa manifestada a través de su historial legislativo, su exposición de motivos, de los diversos informes de las comisiones de las cámaras o de los debates

celebrados en el hemiciclo. <u>S.L.G. Rodríguez-Rivera v. Bahía Park</u>, *supra*, a las págs. 355-356.

Sin embargo, al examinar el historial legislativo debemos estar atentos pues "las leyes han de ser interpretadas a base de lo que la Asamblea Legislativa hizo y no a base de lo que ésta dejó de hacer, ni de la actuación personal de uno de sus miembros". <u>Elicier v. Sucn. Cautiño</u>, 70 D.P.R. 432, 437 (1949).

Las disposiciones de la Ley 95, según descritas al inicio de esta Opinión, claramente denotan la paridad del trato conferido a los intereses del componente local y de los importadores. Entre las medidas promulgadas mediante dicha ley, favorecedoras de la industria de la carne independientemente del origen del producto, notamos el aumentar su consumo en general así como proveer servicios de asesoramiento técnico. Art. 4 de la Ley 95 (5 L.P.R.A. sec. 3003 (2005)).

Como parte de las funciones delegadas a la Oficina de la Reglamentación se destaca el promover mayor participación tanto de los productores locales como de los importadores para recabar su asistencia en lograr los propósitos estatutarios. Art. 6(b) de la Ley 95 (5 L.P.R.A. sec. 3005(b) (2005)). De hecho, la Junta Administrativa a cargo de la administración del Fondo estaba compuesta por representantes de ambos grupos. Art. 10 de la Ley 95 (5 L.P.R.A sec. 3009 (2005)).

Cónsono con lo anterior, igualmente en la Exposición de Motivos de la Ley 95 se recogen intereses salvaguardados en dos renglones paralelos: uno, en base a la salud y, otro, en la economía. De una parte, se reconoce el valor alimenticio de este producto en la dieta humana, por lo que se busca implantar medidas para hacerlo accesible a un mayor número de personas y de este modo mejorar su nutrición. A la par, se promueve el fortalecimiento de la industria mediante la implantación de sistemas de información y mercadeo, ambas gestiones dirigidas a ser de utilidad tanto a las empresas locales como a las importadoras. A estos efectos, la Exposición de Motivos correspondiente precisó lo siguiente:

> Siendo la carne de res alimento básico de alto valor alimenticio en la dieta humana, es nuestro deber dirigir todos los esfuerzos que sean necesarios para lograr el fortalecimiento y desarrollo que requiere esta empresa. Se caracteriza la misma al presente, por una desorganización la cual es visible a diferentes niveles. Reflejo de lo antes indicado es lo siguiente: la carencia de oficinas centralizadas en la cual se pueda tener accesible información sobre precios y condiciones de venta de la carne de res; ausencia de centros de datos sobre diversos aspectos de la industria; falta de orientación y promoción consistente y permanente así como falta de centros de investigación relacionados con la industria de la carne de res.
>
> La permanencia así como la expansión de mercados existentes para la carne de res son de vital importancia **para el bienestar de los productores, importadores y otros relacionados con este mercado** tan importante para la economía de la Isla. De igual manera es importante que la carne de res sea accesible a un mercado eficiente de manera que podamos asegurar una mejor nutrición a nuestro pueblo.

> En consideración a lo aquí expuesto esta Asamblea Legislativa ratifica su intención de promover **el bienestar general de esta industria así como también velar porque el interés público quede protegido**.

(Énfasis nuestro).

La Exposición de Motivos corrobora, por lo tanto, los designios estatutarios según plasmados en la Ley 95. Allí se menciona que, aparte de perseguir un fin salubrista, dicho precepto atendía asuntos de interés de la "industria de la carne" en su acepción más amplia, es decir, contingencias relacionadas al producto independientemente de su origen.

Resalta, pues, del propio texto de la Ley 95, que las medidas implantadas palpablemente implicaban también apoyo a los importadores, quienes a su vez contaban con la presencia de sus representantes en la administración conjunta del Fondo. De la expresión legislativa escrita no se desprende el proteccionismo que intima Northwestern.

A base de lo anterior, resolvemos que el mandato legislativo aparece escrito de forma clara e inequívoca, lo que nos obliga a hacer valer sus términos según consignados en la ley, sin necesidad de acudir a recursos alternos más allá de su letra.

No podemos, por tanto, dictaminar que la Ley 95 discrimina de su faz contra el aspecto negativo de la Cláusula de Comercio de la Constitución Federal, ya que — según redactada — no tiene como fin o propósito beneficiar

a los productores locales en detrimento de los importadores.

Dicho esto, nos toca resolver si hubo discrimen desde la perspectiva práctica en la ejecución de la Ley 95. Respondemos en la afirmativa.

En la implementación de la Ley 95 se denota una incuestionable intención y efecto discriminatorio. A través del Fondo se patrocinó exclusivamente el adelanto de la industria local dejando a un lado los intereses de la competencia proveniente de fuera de la Isla. Al corto tiempo de haberse aprobado la Ley 95 ya existía tensión entre el grupo local y los importadores.

Dentro del periodo aproximado de un año de aprobada la Ley 95 surgieron conflictos entre ambos grupos. Ello suscitó una reunión el 7 de diciembre de 1993 con el entonces Secretario de Agricultura en donde se encontraban también presentes miembros de la Junta Administrativa. Dicha reunión se llevó a cabo con el propósito de propulsar la enmienda de la Ley 95 para eliminar del todo la participación de los importadores en el Fondo y de este modo limitar el alcance de la Ley 95 exclusivamente a la industria de carne de res del país. Según consta en la Minuta correspondiente, el representante de los importadores adscribió la situación imperante a "la dificultad de relaciones entre importadores y productores locales [a la vez que entendió] que es difícil que [el

Fondo según instituido] pueda funcionar adecuadamente".
Ap. 107.

Hubo consenso entre los presentes sobre esta particular enmienda y la Junta Administrativa se comprometió a preparar un borrador del proyecto de enmiendas para trabajarse conjuntamente con el Departamento de Agricultura para que eliminara el componente de los importadores. Ap. 107.

En el Informe Mensual de la Oficina para la Reglamentación de la Industria de Carne de Res correspondiente al mes de junio de 1995,[15] se mencionan reuniones en dos (2) supermercados "relacionado con la venta de carne del país". Ap. 121. De otra parte, se hace referencia a varias reuniones con la Agencia Publimer para preparar la promoción de la carne de res del país. Asimismo, indica sobre su presentación a la Junta Administrativa y al Secretario de Agricultura e informa que la promoción está programada para salir al aire durante el mes de septiembre.

Así las cosas, el Fondo contrató con la Compañía Publimer para el desarrollo de una campaña publicitaria dirigida a promocionar **únicamente** el consumo de carne de res del país. El documento de la campaña oficial aparece fechado el 14 de junio de 1995. Ap. 108-123. Todos los

---

**15**     Este informe, preparado por el Sr. Josep Marull Tauler, entonces Administrador del Fondo y fechado el 18 de septiembre de 1995, iba dirigido al Secretario de Agricultura.

objetivos allí fijados inciden en el producto local y se resumen en los siguientes aspectos publicitarios: (1) crear conciencia de que existe una alternativa real en la carne de res de P.R.; (2) fomentar el consumo de carne de res de P.R.; (3) crear imagen positiva; (4) crear reconocimiento de nombre, y (5) demostrar frescura y calidad del producto. Ap. 237.

La campaña, que se difundió ampliamente a través de la radio y la prensa local, se extendió desde septiembre a noviembre de 1995. Ap. 124-126. Su costo total ascendió a doscientos setenta y nueve mil ochocientos sesenta y nueve dólares con ochenta y cinco centavos ($279,869.85). Ap. 123.

No cabe duda de que todos los anuncios pautados bajo este cometido se circunscribieron a impulsar **única y exclusivamente** la producción de carne local. Mediante la mencionada publicidad se destacaron las bondades del producto elaborado en la Isla, particularmente su frescura, sabor y calidad. A la vez se acentuó su origen, indicando que ello constituía "lo mejor de nuestra tierra." Ap. 127-152.

Resulta evidente que, al utilizar los recaudos decretados por la Ley 95 para fines exclusivos de la promoción de la industria local en detrimento de los provenientes de fuera de la Isla, se les estaba cobrando a los importadores un recaudo con fines estrictamente

proteccionistas, en contravención a las disposiciones de la Cláusula de Comercio durmiente.[16]

Esta finalidad proteccionista quedó también puesta de manifiesto con la aprobación de la Ley 238. Este nuevo precepto cristalizó la política pública gubernamental prevaleciente en ese momento, la cual pretendía "promover el desarrollo de la Industria Agropecuaria y sentar las bases para el apoderamiento, por parte de los agroempresarios de sus negocios agrícolas". Exposición de Motivos de la Ley 238, Leyes de Puerto Rico, pág. 1306. En otras palabras, a través de la nueva legislación se estaba proporcionando un instrumento para el autocontrol del mencionado sector, a través de acuerdos entre sus componentes, limitando el rol del gobierno a uno de mero facilitador.

A base de lo antes expuesto, decretamos que la Ley 95 en su implementación, atenta contra los principios que alientan el postulado constitucional que nos ocupa. No cabe duda de que se utilizó el mecanismo de las aportaciones requeridas a los importadores para beneficio exclusivo de la industria nativa promoviendo el consumo de su producto y adelantando sus intereses en el mercado local. Esta gestión, a todas luces proteccionista, claramente lesiona los intereses de las entidades importadoras quienes vienen obligadas a sobrellevar una

---

[16] Notamos que, no empece el costo considerable de la publicidad en cuestión, no consta en autos evidencia alguna que acredite qué otro uso, si alguno, se le dio al presupuesto allegado al Fondo en virtud de la Ley 95.

carga económica desigual por la mera razón de estar radicadas fuera de la Isla.

Es importante destacar que no estamos aquí frente a las acciones del Gobierno actuando bajo el manto de sus funciones de poder de razón de estado ("police power"), mediante la cual se utilizan fondos públicos para proteger la salud de sus constituyentes o reforzar la economía a través de subsidios o programas dirigidos a fortalecer la industria local. Por el contrario, nuestro análisis se encuentra centrado en la validez del esquema establecido mediante una cuota mandatoria asignada a los importadores con el exclusivo fin y propósito de adelantar la causa de sus competidores nativos.

En vista de nuestra determinación, se hace innecesario discutir los errores restantes consignados por la parte peticionaria.

## VIII

Decretamos, por lo tanto, que por constituir una medida protectora discriminatoria, la Ley 95, en su implementación, vulnera la Cláusula de Comercio de la Constitución de los Estados Unidos en su estado durmiente. Por consiguiente, se revoca la Sentencia recurrida.

Se dictará Sentencia de conformidad.

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| ESTADO LIBRE ASOCIADO DE PUERTO RICO Y EL SECRETARIO DEL DEPARTAMENTO DE HACIENDA<br><br>Recurridos<br><br>v.<br><br>NORTHWESTERN SELECTA, INC.<br><br>Peticionaria | **Núm. CC-2009-1091** | *Certiorari* |

SENTENCIA


En San Juan, Puerto Rico, a 27 de marzo de 2012.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, decretamos que por constituir una medida protectora discriminatoria, la Ley 95, en su implementación, vulnera la Cláusula de Comercio de la Constitución de los Estados Unidos en su estado durmiente. Por consiguiente, revocamos la Sentencia recurrida.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta disiente con opinión escrita a la que se une el Juez Presidente señor Hernández Denton. La Juez Asociada señora Rodríguez Rodríguez concurre y disiente con opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico y el Secretario
del Departamento de Hacienda
          Recurridos                    CC-2009-1091
                                                    *Certiorari*

          v.


     Northwestern Selecta, Inc.
          Peticionaria


Opinión Disidente emitida por la Jueza Asociada señora FIOL MATTA a
la que se une el Juez Presidente señor HERNÁNDEZ DENTON


San Juan, Puerto Rico, a 26 de marzo de 2012.

La norma que hoy adopta el Tribunal tendrá consecuencias muy graves, pues limita, de manera excesiva y totalmente innecesaria, los poderes de razón de estado de nuestra Asamblea Legislativa para aprobar medidas válidas en beneficio de la malograda economía del país. La consecuencia –deseada o no- de esta decisión es que toda acción legislativa que pretenda apoyar o beneficiar a la industria puertorriqueña sobre las demás estará sujeta a un análisis constitucional riguroso de virtual invalidación. De esa forma, la Opinión

mayoritaria debilita seriamente la capacidad del gobierno de Puerto Rico para defender, desarrollar, beneficiar, incentivar y reactivar nuestra economía.

A este resultado se llega partiendo de la premisa equivocada de que la cláusula de comercio de la Constitución federal, en su estado durmiente, aplica a los hechos del presente caso. Al aceptar la alegación del peticionario, la mayoría se fija tan solo en que el caso envuelve una contribución y una actuación gubernamental que alegadamente da preferencia al comerciante local sobre el extranjero. Ese análisis unidimensional no toma en consideración la abundante jurisprudencia federal que establece claras distinciones entre las situaciones que deben ser analizadas bajo la cláusula de comercio y las que requieren otro enfoque constitucional, particularmente, un análisis de subsidio compelido de expresión gubernamental bajo la cláusula de libertad de expresión, que es el que debe usarse en este caso.

Pero aun bajo su propia premisa, es decir, que la situación planteada en este caso requiere determinar si se ha violado la cláusula de comercio federal, la Opinión mayoritaria adolece de dos defectos que invalidan sus conclusiones. En primer lugar, la mayoría confunde el análisis ordinario requerido por el Tribunal Supremo de los Estados Unidos para ataques constitucionales a una legislación, de su faz o en su aplicación, con el análisis para efectos de la cláusula de comercio que distingue entre

una actuación gubernamental que discrimina de su faz contra el comercio interestatal y un estatuto que discrimina contra éste en su aplicación. Por eso, el Tribunal comete el error de concluir que la contribución impuesta a los importadores de carne de res no es válida, bajo la normativa de la cláusula de comercio, por el uso que se le dio al dinero recolectado, que fue adelantar un mensaje alegadamente discriminatorio contra ellos. Como veremos, la diferencia entre una contribución discriminatoria de su faz y una que discrimina en su aplicación, en lo que concierne a la cláusula de comercio, nada tiene que ver con el **uso** que se le dé al dinero recolectado por la contribución. Tal conclusión es ajena a toda la jurisprudencia interpretativa de dicha disposición constitucional. Dado que en este caso las tasas contributivas son iguales tanto para los importadores como para los productores locales, el escrutinio aplicable bajo la cláusula de comercio durmiente, si alguno, es el de "excesiva onerosidad". La prueba presentada por Northwestern, la peticionaria en este caso, no sostiene la conclusión de inconstitucionalidad bajo ese escrutinio.

En segundo lugar, el Tribunal omite los desarrollos normativos sobre la cláusula de comercio durmiente que operan como excepciones a los límites establecidos por ésta y son pertinentes a esta controversia. En particular, no profundiza en la doctrina del "participante en el mercado" y el poder que tienen los Estados para beneficiar a sus

comerciantes locales sobre los de otras jurisdicciones, siempre y cuando el Estado no intervenga exclusivamente como ente regulador y, en esa función, establezca un obstáculo considerable al comercio interestatal.

Por entender que el Tribunal aplica el análisis constitucional equivocado y, peor aún, lo aplica equivocadamente al adoptar una normativa incompleta e innecesariamente restrictiva de la cláusula de comercio en su estado durmiente, disiento.

I.

Para identificar con precisión el análisis constitucional requerido para atender adecuadamente esta controversia, hay que indagar con mayor profundidad en los hechos del caso ante nuestra consideración.

Mediante la Ley para Crear la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res (Ley 95),17 el gobierno de Puerto Rico adoptó como política pública el desarrollar y fortalecer la industria de la carne de res en la isla. Según se desprende de la Exposición de Motivos de la Ley 95, "[s]iendo la carne de res [un] alimento básico de alto valor alimenticio en la dieta humana, es nuestro deber dirigir todos los esfuerzos que sean necesarios para lograr el fortalecimiento y desarrollo que requiere esta empresa".18 La Asamblea

---

17 Ley Núm. 95 de 29 de noviembre de 1992, 5 L.P.R.A. sec. 3001 *et seq.*

18 Leyes de Puerto Rico 1992, p. 615.

Legislativa concluyó que "[l]a permanencia[,] así como la expansión de mercados existentes para la carne de res[,] son de vital importancia para el bienestar de los <u>productores</u>, <u>importadores</u> y otros relacionados con este mercado tan importante para la economía de la Isla".19 Es decir, que el propósito expreso y declarado de la ley era promover los intereses de la industria de la carne, incluyendo productores locales e importadores.20 Finalmente, y ante el interés apremiante del estado de garantizar el abasto de alimentos de la población, la Asamblea Legislativa declaró que "es importante que la carne de res sea accesible en un mercado eficiente de manera que podamos asegurar una mejor nutrición a nuestro pueblo".21 De igual forma, vinculó el desarrollo de la industria de la carne de res con la "creación de fuentes de empleo".22

Para lograr este objetivo, la ley delegó en dicha Oficina la "responsabilidad de adoptar y poner en vigor <u>varios</u> programas y medidas orientadas a propiciar el

---

19 (Énfasis suplido) *Id*.

20 Según la Ley 95, entre los fines y propósitos del estatuto está "[p]romover el mercado ordenado <u>tanto</u> de la carne de res producida localmente así como la importada". (Énfasis suplido) 5 L.P.R.A. sec. 3003. A través de todo el estatuto se puede notar referencias tanto al productor local como al importador de carne. 5 L.P.R.A. secs. 3001, 3005(b), entre otras.

21 Leyes de Puerto Rico 1992, p. 615.

22 5 L.P.R.A. sec. 3005(d).

desarrollo de una industria [ganadera] próspera".23 Es decir, la ley no se limita a una actividad en particular, sino que abarca numerosos programas e iniciativas con miras a adelantar el fin legislativo.24 Entre otras medidas, la Ley 95 estableció un Fondo para el Fomento de la Industria de la Carne de Res. Las aportaciones a dicho Fondo provendrían de una contribución especial dirigida tanto a productores locales como a importadores de carne de res. A los productores locales se les cobraría $4.14 por cada animal sacrificado en matadero y $1.00 por cada ternero. Por su parte, los importadores pagarían un centavo ($0.01) por cada libra de carne importada "tomando como base el pago hecho para el producto local en consideración al rendimiento del animal sacrificado por el productor local".25 Es decir, la cantidad que pagarían los importadores por cada libra importada equivaldría, dentro de una aproximación, a lo aportado por los productores. De esa forma la Asamblea Legislativa se aseguró que la contribución fuese lo más semejante posible entre el productor y el importador, evitando así un trato discriminatorio. Por último, la Ley 95 dispuso que "[l]as aportaciones al Fondo comenzarán a ser

---

23 (Énfasis suplido) 5 L.P.R.A. sec. 3002.

24 Según la Ley 95, la Oficina tiene el "propósito principal de promover actividades, programas y servicios que propicien el desarrollo y fortalecimiento de la industria de la carne de res en Puerto Rico". 5 L.P.R.A. sec. 3003.

25 5 L.P.R.A. sec. 3008.

exigibles treinta (30) días después de la vigencia de la Ley".26

El texto de la Ley 95 no explica cómo se distribuirían los recaudos del Fondo entre los diferentes programas a establecerse. No obstante, dispone que al menos el 10% de lo recaudado se utilizará para sufragar la operación y administración de la Oficina creada por el estatuto.27

La peticionaria Northwestern Selecta, Inc. ("Northwestern") es una importadora de carne de res según definido por la Ley 95.28 Por tanto, estaba obligada a pagar un centavo por cada libra de carne de res importada desde el 29 de diciembre de 1992. Sin embargo, la peticionaria no pagó la contribución impuesta por la Ley 95, acumulando una deuda con el ELA de $301,526.28.29 Esta deuda representa los tres años de vigencia de la Ley 95, periodo en que Northwestern no hizo aportación alguna al Fondo.

Ante la falta de pago de Northwestern, el ELA presentó una demanda en cobro de dinero, alegando que la deuda era líquida, vencida y exigible. Por su parte, Northwestern sostuvo que la Ley 95 era inconstitucional por violar su derecho a la libre expresión, al obligarla a pagar una contribución que sería utilizada para sufragar una campaña

---

26 *Id.*

27 5 L.P.R.A. sec. 3003.

28 5 L.P.R.A. sec. 3001.

29 Sentencia del Tribunal de Primera Instancia, p. 1; Apéndice petición de *certiorari*, p. 75.

dirigida por la Oficina Reglamentadora que favorecía el consumo de la carne producida localmente sobre la carne que era importada.

Según se desprende del expediente, la campaña publicitaria que promovía el consumo de carne de res local se inició el 14 de junio de 1995, dos años y medios después de la vigencia de la Ley 95 y de la contribución especial establecida en dicho estatuto.30 Northwestern, según sus propias alegaciones, no pagó la contribución especial por los primeros dos años y medio de vigencia de la Ley 95, es decir, desde antes del inicio de la campaña publicitaria que ahora impugna. Sin embargo, insiste en que no debe cantidad alguna porque la Ley 95, según aplicada a través de la campaña publicitaria que favorecía el consumo de la carne local sobre la importada, tiene vicios constitucionales.

La peticionaria sostiene que el costo de dicha campaña publicitaria fue de $279,869.85.31 A su vez, quedó demostrado que el dinero recaudado por el Fondo superó notablemente la cantidad alegadamente invertida en la campaña publicitaria.32 Es decir, gran parte del dinero

---

30 Petición de *certiorari*, p. 3.

31 *Id.*

32 A modo de ejemplo, según el Informe Mensual correspondiente al mes de junio de 1995 de la Oficina para la Reglamentación de la Industria de la Carne de Res, el total de fondos acumulados en el año fiscal 1994-95 fue de **$769,575.86**; Apéndice petición de *certiorari*, p. 117. No obstante, las partes no nos han suministrado información que nos permita saber la totalidad de los fondos recaudados durante la vigencia de la Ley 95. Lo que sí

obtenido por virtud de la Ley 95 no se utilizó para dicha campaña. En efecto, la mayor parte del dinero recaudado por el Fondo no fue utilizado para la campaña impugnada, sino que se usó para los demás fines de la Ley 95, que Northwestern no ha impugnado y de los que se ha beneficiado, sin aportar dinero alguno como ordena el estatuto.

Ante el Tribunal de Primera Instancia, Northwestern adelantó dos argumentos principales. En primer lugar, que la contribución dispuesta por la Ley 95 es inconstitucional al constituir una "imposición forzosa por parte del gobierno de una aportación económica que sería utilizada para fomentar expresiones que son contrarias a sus intereses".33 Es decir, cuestionó la validez de la contribución frente a su derecho a la libertad de expresión. En segundo lugar, cuestionó el traslado del Fondo establecido por la Ley 95 a uno de los fondos creados por la Ley Núm. 238 de 18 de septiembre de 1996 ("Ley 238").34 Esa ley dispuso que el remanente del Fondo creado originalmente por la Ley 95 para el desarrollo de toda la industria de carne de res en Puerto Rico sería trasladado a uno de los fondos creados para cada sector o grupo de sectores comprendidos en la industria agropecuaria. La Ley 238 excluyó a los importadores, pues el propósito del

---

podemos colegir de la información previamente descrita es que el dinero utilizado en la campaña impugnada representa una fracción del total de fondos recaudados por la Ley 95.

33 Sentencia del Tribunal de Apelaciones, p. 8; Apéndice petición de *certiorari*, p. 10.

34 Ley para el Ordenamiento de las Industrias Agropecuarias de Puerto Rico, 5 L.P.R.A. sec. 3051 *et seq.*

nuevo estatuto, distinto a la Ley 95, sí era fomentar la industria local.35 Northwestern también alegó que, como la Ley 238 no requirió la contribución de los importadores al nuevo fondo, ello tuvo el efecto retroactivo de librarle del pago de las contribuciones adeudadas bajo la Ley 95.

Ambas partes presentaron mociones de sentencia sumaria ante el foro de instancia. El Tribunal de Primera Instancia declaró sin lugar la solicitud presentada por Northwestern y, según solicitado por el ELA, ordenó a la peticionaria pagar la deuda de $301,526.28. Según el foro primario, la campaña publicitaria realizada con los fondos recaudados bajo la Ley 95 era una expresión gubernamental legítima y no violó el derecho constitucional a la libre expresión de Northwestern.36 En particular, el foro primario concluyó que "resulta evidente que los fondos recaudados por las aportaciones de la Ley 95 no se destinarán exclusivamente para adelantar los intereses de la carne de res local sino que se destinarán para múltiples actividades en beneficio del público consumidor".37 En cuanto al segundo argumento de la peticionaria, el foro de instancia concluyó que si hubiese sido la intención de la Asamblea Legislativa eximir a los importadores del pago de la aportación impuesta por la Ley 95 durante su vigencia, ello se hubiese hecho constar en

---

35 5 L.P.R.A. sec. 3056.

36 Sentencia del Tribunal de Primera Instancia, p. 12; Apéndice petición de *certiorari*, p. 86.

37 *Id.*

la Ley 238.38 De igual forma, validó la acción legislativa de transformar el fondo creado bajo la Ley 95.

Northwestern recurrió al Tribunal de Apelaciones y éste confirmó la sentencia del tribunal de instancia. Según el foro apelativo, la controversia entre las partes requiere un análisis bajo la normativa sobre subsidio compelido de expresión gubernamental.39 Aplicando la norma de U.S. v. United Foods, Inc.40 y Glickman v. Wileman Bros. & Elliots,41 el foro intermedio concluyó que la campaña publicitaria impugnada constituye una expresión legítima que adelanta un interés gubernamental sustancial y que forma parte de un esquema abarcador para atender las necesidades de la industria de la carne de res en Puerto Rico. Ante el apelativo, Northwestern alegó, por primera vez, que el cobro de la contribución bajo la Ley 95 y el uso parcial de lo recaudado para financiar la campaña publicitaria viola la cláusula de comercio de la Constitución federal, en su estado durmiente. El foro apelativo no consideró los méritos de dicha contención al entender que se debió haber presentado primero ante el tribunal de instancia. El Tribunal de Apelaciones también validó los cambios realizados al fondo por la Ley 238.

_____

38 *Id*, p. 20; Apéndice petición de *certiorari*, p. 94.

39 Sentencia del Tribunal de Apelaciones, p. 11.

40 533 U.S. 405 (2001).

41 521 U.S. 457 (1997).

Inconforme, Northwestern presentó una petición de *certiorari* ante este Tribunal alegando la comisión de cuatro errores. Aduce que el historial legislativo de la Ley 95 demuestra que ésta tiene un objetivo discriminatorio.42 También se reafirma en que la Ley 95 es contraria a la libertad de expresión al obligarle a "financiar el mercado del producto de su competencia".43 En cuanto a la impugnación de la Ley 95 al amparo de la cláusula de comercio, la peticionaria insiste en que el uso de la contribución requerida para promover la carne local convirtió dicho estatuto en inconstitucional en su aplicación. Por último, repite su posición de que la Ley 238 le liberó de su deber de pagar la contribución impuesta por la Ley 95.

Por su parte, el ELA sostiene que el fondo es parte de un amplio marco reglamentario y el uso del dinero en publicidad es "mínimo e incidental a actividades de diversa naturaleza subsidiadas con las aportaciones establecidas [en la Ley 95]".44 En cuanto a la alegación de Northwestern de que dicha contribución violenta sus derechos a la libertad

---

42 No obstante, las porciones del historial legislativo que Northwestern presenta tienden a confirmar que la Ley 95 no es discriminatoria. Por ejemplo, se hace referencia a las expresiones del entonces Secretario de Agricultura quien, ante una pregunta sobre si la Ley 95 ayudaría a la industria local de carne, éste contesta que el Fondo establecido por dicho estatuto no tiene como propósito promover los productos locales. Véase petición de *certiorari*, p. 7.

43 *Id*, p. 9.

44 Alegato del Estado Libre Asociado de Puerto Rico, p. 5.

de expresión, el ELA arguye que se trata de expresión gubernamental que no está sujeta al escrutinio estricto y que se fundamenta en la "legítima política pública del Estado de promover la industria de la carne de res".45 El ELA sostiene que está adelantando el interés estatal importante de desarrollar la economía del país apoyando a la industria de la carne de res en general. De igual forma, el gobierno propone que la Ley 95 también tiene como objetivo salvaguardar la salud de la población. Finalmente, el ELA no discute el error relacionado con la aplicación de la cláusula de comercio en su estado durmiente, por entender que se presentó tardíamente. Como veremos, esto es crucial, pues todos los análisis referentes a la cláusula de comercio requieren que el Estado presente prueba antes de que un tribunal pase juicio sobre la inconstiucionalidad de una ley.

II.

La Opinión del Tribunal insiste en que este caso está sujeto a la normativa sobre la cláusula de comercio durmiente. Se equivoca. Igualmente, se equivoca al no reconocer que, aun si se tratara de un caso de cláusula de comercio, están presentes algunas de las excepciones a dicha doctrina reconocidas por la jurisprudencia. Finalmente, la normativa general sobre la cláusula de comercio en su estado durmiente es diferente a la adoptada hoy por el Tribunal y

---

45 *Id.*

es mucho menos restrictiva que lo que se desprende de la Opinión. Los efectos nocivos del criterio mayoritario sobre las facultades de nuestra legislatura para atender los problemas económicos del país nos requieren un análisis constitucional más adecuado.

La Constitución de los Estados Unidos delega en el Congreso el poder para regular el comercio con las naciones extranjeras y entre los diferentes Estados, así como las tribus indígenas.46 Por vía de esta disposición, mejor conocida como la cláusula de comercio, el congreso federal tiene un poder amplio para organizar la economía nacional de los Estados Unidos. Muchas de las leyes aprobadas por el Congreso surgen de sus poderes bajo esta cláusula. Ahora bien, además del poder afirmativo que esta disposición constitucional otorga al Congreso para actuar en cuanto al comercio interestatal, el Tribunal Supremo de los Estados Unidos ha resuelto que la cláusula de comercio también tiene un efecto restrictivo sobre los poderes de los estados y demás jurisdicciones de los EEUU de adoptar legislación económica que afecte el comercio interestatal.47 A esa doctrina se le conoce como la cláusula de comercio en su estado durmiente. Esta limitación, cuyo propósito es evitar el proteccionismo económico por parte de los gobiernos

_____

46 Constitución de los Estados Unidos, Artículo I, Sección 8, cláusula 3. "The Congress shall have the Power […] [t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes".

47 Camps Newfound/Owatonna v. Town of Harrison, 520 U.S. 564, 571 (1997).

locales, existe aunque no haya acción congresional al amparo de la cláusula de comercio.48 Como veremos a continuación en más detalle, las limitaciones de la cláusula de comercio en su estado durmiente aplican únicamente a actuaciones estatales de naturaleza reglamentaria o contributiva que sean discriminatorias en sí mismas o que constituyan una carga indebida sobre el comercio interestatal y, por eso, se conviertan en un obstáculo a la economía de los Estados Unidos como conjunto.49 No obstante, el objetivo de impedir obstáculos locales al flujo de comercio interestatal "no eleva el libre comercio sobre todos los demás valores".50 Es

---

48 Dep't of Revenue v. Davis, 553 U.S. 328, 337-338 (2008). En sentido contrario, el Congreso federal puede autorizar que un estado o jurisdicción adopte reglamentación que de otra forma estaría prohibida bajo la cláusula de comercio durmiente. Maine v. Taylor, 477 U.S. 131, 158 (1986). Según el Tribunal Supremo federal, el origen de esta doctrina reside en la preocupación dual de los constituyentes estadounidenses por que no se produjera la llamada "balcanización" de la economía, y tampoco que, a nombre de este objetivo unificador, se prescindiera del federalismo y la autonomía local. Id, p. 338. Véase, además, United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007).

49 GMC v. Tracy, 519 U.S. 278, 287 (1997). "The negative or dormant implication of the Commerce Clause prohibits state taxation […] or regulation that discriminates against or unduly burdens interstate commere and thereby impedes free private trade in the national marketplace". Véase, además, Hughes v. Alexandria Scrap Crop., 426 U.S. 794, 803 (1976).

50 (Énfasis suplido) United Haulers Ass'n v. Oneida, supra, p. 344, citando a Maine v. Taylor, 477 U.S. 131, 151 (1986). "The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values".

decir, si bien, en ciertas circunstancias, la cláusula limita el poder de los estados para aprobar legislación económica,51 no elimina este poder del todo. Por el contrario, los estados y demás jurisdicciones preservan sus poderes de razón de estado para adoptar aquellas medidas económicas que protejan la salud, la seguridad y el bienestar general de sus ciudadanos. Incluso, como veremos a continuación, estos poderes pueden emplearse de tal forma que favorezcan intereses económicos locales sobre el comercio interestatal sin que ello constituya una violación a la cláusula de comercio en su estado durmiente.52 Como resolvió el Tribunal Supremo federal en Camp Newfound/Owatonna v. Town of Harrison, "[l]a cláusula de comercio no prohíbe toda acción estatal diseñada para dar a sus residentes ventajas en el mercado".53

---

51 Bacchus Imps. v. Dias, 468 U.S. 263, 271 (1984).

52 Id. "No one disputes that a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry".

53 Camp Newfound/Owatonna v. Town of Harrison, supra, p. 590. "The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace". Al igual que muchos otros análisis de índole constitucional, al examinar esta cláusula no cabe una visión mecánica ni una aplicación automática. Véase United Bldg. & Constr. Trades Council v. Camden, 465 U.S. 208, 219 (1984). Tampoco podemos olvidar que el análisis bajo la cláusula de comercio durmiente no es de naturaleza sustantiva; su única finalidad es determinar si la acción estatal tiene un propósito discriminatorio, sin justificación para ello, o, si no lo tiene, cuál es su efecto sobre el comercio interestatal. Bajo un análisis de cláusula de comercio no hace falta que el estado presente una justificación independiente para su proceder. Hughes v. Alexandria Scrap Corp., supra, p. 809. "We do not

La doctrina de la cláusula de comercio durmiente no ha estado exenta de críticas. Por el contrario, muchos impugnan su existencia y validez bajo la Constitución federal,54 enfatizan los peligros de una aplicación sobre-extendida y critican su desarrollo jurisprudencial accidentado.55 No es de extrañar, pues, que la jurisprudencia más reciente del Tribunal Supremo federal apunte en dirección contraria a la que adopta la Opinión mayoritaria en este caso. Distinto a lo que hace hoy nuestro Tribunal, el Tribunal Supremo federal se ha mostrado más propenso a eliminar las

---

believe the Commerce Clause was intended to require independent justification for such action". Véase, además, White v. Mass. Council of Constr. Emprs., 460 U.S. 204, 207 (1983).

54 A modo de ejemplo, el Juez Asociado del Tribunal Supremo de los Estados Unidos Clarance Thomas ha sostenido consistente y enfáticamente que la doctrina de la cláusula de comercio en su estado durmiente no tiene base alguna en la Constitución y que descartaría toda la jurisprudencia federal a esos efectos. "I would entirely discard the Court's negative Commerce Clause jurisprudence. […] [It] has no basis in the Constitution". Dep't of Revenue v. Davis, *supra* p. 361 (Thomas, concurrente). Véase, además, United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, p. 349 (Thomas, concurrente).

55 Otro crítico de la doctrina de la cláusula de comercio en su estado durmiente es el Juez Asociado Antonin Scalia. En su disidente en Camps Newfound/Owatonna v. Town of Harrison en 1997, a la que se unieron los jueces Rehnquist, Ginsburg y Thomas, el juez Scalia sostiene que la doctrina de la cláusula de comercio durmiente se ha desviado de su origen. *Id*, p. 595 (Scalia, disidente). "The Court's negative-commerce-clause jurisprudence has drifted far from its moorings". Desde entonces, el alto foro federal ha limitado considerablemente las restricciones bajo esta figura. Véase, además, Dep't of Revenue v. Davis, *supra*, p. 359 (Scalia, concurrente) y United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra*, p. 348 (Scalia, concurrente).

restricciones a los poderes estatales impuestos bajo la cláusula de comercio durmiente y a identificar excepciones a la doctrina, todo lo cual torna en inapropiado e innecesario un análisis bajo dicha disposición en muchos casos.56 Atrás quedaron las aplicaciones inflexibles de esta doctrina que hoy revive este Tribunal.57

Como adelantáramos, la cláusula de comercio en su estado durmiente aplica únicamente cuando el estado reglamenta el comercio.58 Es decir, no toda participación

---

56 *Véase*, por ejemplo, Dep't of Revenue v. Davis, *supra* (2008); United Haulers Ass'n. v. Oneida-Herkimer Solid Waste Mgmt. Auth., *supra* (2007); Am. Trucking Ass'n v. Michigan, 545 U.S. 429 (2005); GMC v. Tracy, *supra* (1997).

57 Durante la década de 1930 y 1940, el Tribunal Supremo de los Estados Unidos amplió considerablemente el radio de aplicación de la cláusula de comercio en su estado durmiente. Véase, por ejemplo. Baldwin v. G.A.F. Selig, 294 U.S. 511 (1935) y Hood & Sons v. Du Mond, 336 U.S. 525 (1949). Es en esos casos que vemos referencias a que la unidad económica nacional de los Estados Unidos es inquebrantable y prohibiciones a la reglamentación estatal discriminatoria o excesivamente obstaculizadora. No podemos perder de perspectiva que estos casos se resuelven en un momento particular en la historia de ese país en el que se estaban afirmando los poderes del gobierno federal bajo la cláusula de comercio. Las expresiones más recientes del Tribunal Supremo de los EEUU se han alejado de ese nacionalismo económico a favor de reconocer el rol de los gobiernos locales frente a sus respectivos retos económicos.

58 Dep't of Revenue v. Davis, *supra*, p. 337. "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism, that is regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors". Cabe mencionar que en este caso el Tribunal Supremo federal validó la acción gubernamental impugnada por entender que el estado no actuó exclusivamente en su rol como reglamentador de la actividad económica. *Id*, p. 348. Véase, además, Maine v. Taylor, *supra*, p. 138. "In determining whether a State has overstepped its role in

del estado en la economía activa un análisis relacionado a la cláusula de comercio:

> La Cláusula de Comercio no prohíbe toda acción estatal diseñada para dar a sus residentes una ventaja en el mercado, sino aquella acción de esa descripción en conexión con la reglamentación estatal del comercio interestatal.59

De igual manera, en Hughes v. Alexandria Scrap Cop., *supra*, el máximo foro federal reconoció que "el hilo conductor de todos estos casos [sobre la cláusula de comercio en su estado durmiente] es que el estado intervino con el funcionamiento natural del mercado interestatal ya sea mediante una prohibición o mediante una reglamentación onerosa".60 Por tanto, para motivar un análisis bajo esta disposición constitucional federal hace falta que la reglamentación impugnada incluya una acción estatal afirmativa que controle, obligue, discrimine, prohíba o imponga sobre el comercio interestatal alguna carga indebida, y, además, obstaculice o impida el comercio interestatal. Si la acción estatal discriminatoria no obliga

---

regulating interstate commerce…"; Granholm v. Heald, 544 U.S. 460 (2005).

59 (Énfasis en original) New Energy Co. v. Limbach 486 U.S. 269, 278 (1988). "The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description , in connection with the State's regulation of interstate commerce".

60 (Énfasis suplido) Hughes v. Alexandria Scrap Corp., *supra*, p. 806. "The common thread of all these cases is that the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation".

o prohíbe conducta, o ésta no afecta indebidamente el comercio interestatal, no hay violación a la cláusula de comercio durmiente.

Por el contrario, cuando el estado actúa en su rol como "participante en el mercado", ni siquiera hay cabida para un análisis bajo la cláusula de comercio en su estado durmiente.61 En palabras del Tribunal Supremo federal, "[c]uando un gobierno local o estatal entra al mercado como un participante no está sujeto a las limitaciones de la cláusula de comercio".62 En esos casos, el estado puede entrar al mercado "para ejercer su derecho a favorecer a sus propios ciudadanos sobre otros",63 incluso si dicha participación es dañina al libre comercio entre los estados.64 Una vez se determina que el estado actúa en su capacidad como participante del mercado y no como ente regulador, ahí cesa el análisis bajo la cláusula de comercio.65 Como veremos con más detenimiento al abordar el

---

61 New Energy v. Limbach, *supra*, p. 277. "[The market participant doctrine] "differenciates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause".

62 Dep't of Revenue v. Kentucky, *supra*, p. 339. "When a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause".

63 *Id*. "[S]o as to exercise the right to favor their own citizens over others".

64 *Id*, p. 353.

65 *Id*.

asunto específico que nos ocupa en este caso, la imposición de contribuciones alegadamente discriminatorias, cuando la reglamentación mediante impuestos va mano a mano con una participación estatal en el mercado, tampoco procede cuestionar dicha conducta como reglamentación estatal sujeta a la cláusula de comercio.66 En síntesis, la pregunta clave es si el Estado está participando en el mercado o si se limita únicamente a reglamentarlo. Si se trata de la primera situación o una combinación de ambas, no hay espacio para impugnar su actuación al amparo de la cláusula de comercio en su estado durmiente.

A modo de ejemplo, en White v. Mass. Council of Constr. Emplrs., *supra*, el Tribunal Supremo federal validó una orden ejecutiva emitida por un alcalde que exigía que en toda construcción hecha con fondos municipales al menos 50% de los empleados fuesen residentes de la ciudad. Es decir, la ciudad discriminó afirmativamente contra aquellos contratistas que no emplearan una mayoría de trabajadores de la localidad. El alto foro federal reiteró la norma según la cual una vez se determina que el programa constituye una participación directa del estado en el mercado, cesa el análisis bajo la cláusula de comercio. A tono con dicha

---

66 *Id*, pp. 347-348. "In sum, our cases on market regulation without market participation prescribe standard dormant Commerce Clause analysis; our cases on market participation joined with regulation (the usual situation) prescribe exceptional treatment for this direct governmental activity in commercial markets for the public benefit".

norma, resolvió que no había base constitucional para invalidar la medida adoptada por la ciudad en ese caso. En palabras del Tribunal Supremo:

> El impacto sobre los que no residen en el estado sería factor en la ecuación solamente si se decide que la ciudad está reglamentando el mercado y no participando en éste, pues solamente en el primer caso es que será necesario determinar si la posible carga sobre el comercio interestatal está permitida por la cláusula de comercio.67

En Reeves, Inc. v Stake,68 se cuestionó si un estado, en un periodo de escasez, podía disponer que el cemento que el propio estado producía se vendiera únicamente a sus residentes. Para el Tribunal, el elemento fundamental era que el estado era el vendedor del cemento. Por tanto, no estaba sujeto a las restricciones de la cláusula de comercio en su estado durmiente. El Tribunal Supremo concluyó que los programas estatales que están diseñados para servir a los ciudadanos que los crean, como las universidades públicas estatales y las autoridades generadoras de energía, entre otras, no están sujetos a las restricciones de la cláusula de comercio en su vertiente durmiente.

En Hughes v. Alexandria Scrap Corp, *supra*, el primer caso del Tribunal Supremo de los Estados Unidos en el que se

---

67 (Énfasis suplido) White v. Mass. Council of Constr. Emplrs., *supra*, p. 210. "Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause".

68 447 U.S. 429 (1980).

aplicó la excepción de "participante en el mercado", se impugnó un programa estatal para la compra de chatarra de vehículos de motor abandonados que imponía requisitos más onerosos a los que no residían en el estado en contraposición a la ciudadanía local. Dado que el estado no estaba obligado a comprar la chatarra, sino que se obligó voluntariamente a comprarlo, ello lo convertía en un participante en el mercado en concepto de comprador. Por tanto, al igual que cualquier entidad privada que se dedicara a comprar chatarra, el estado estaba en libertad de decidir a quién le compraba y bajo qué condiciones, aunque ello conllevase un trato diferencial discriminatorio contra vendedores potenciales de otros estados.69

Además de la excepción del "participante en el mercado", la jurisprudencia federal ha desarrollado otras excepciones a la aplicación de la cláusula de comercio durmiente. Específicamente, el Tribunal Supremo de los Estados Unidos ha resuelto que una reglamentación discriminatoria o que imponga una carga excesivamente onerosa sobre el comercio interestatal puede ser válida bajo la cláusula de comercio en su estado durmiente si a quien

---

69 Igual ocurrió en New Energy v. Limbach, *supra*. En dicho caso, el Tribunal Supremo federal resolvió que "cuando un estado decide manufacturar y vender cemento, sus métodos de negocio, incluyendo aquellos que favorecen a sus residentes, no constituyen mayor problema constitucional que los de un negocio privado". (Énfasis suplido) *Id*, p. 277. "[W]hen a State chooses to manufacture and sell cement, its business methods, including those that favor its residents, are of no greater constitutional concern than those of a private business".

favorece es al propio estado. En <u>United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth</u>, *supra*, el gobierno municipal requirió, en su capacidad como ente reglamentador, que <u>todos</u> los desperdicios sólidos producidos en la ciudad fuesen procesados por una corporación pública establecida a esos efectos; es decir, legisló a favor de un monopolio local público. El Tribunal Supremo resolvió que, si bien el municipio no podía obligar a sus residentes a usar únicamente una instalación local privada de manejo de desperdicios, sí podía hacerlo a favor de una instalación local <u>pública</u>. Resolvió, en conclusión, que el Estado, <u>como ente regulador</u>, puede discriminar contra el comercio interestatal, siempre y cuando sea <u>en su beneficio</u> y no en beneficio de la industria privada local.

El examen que hemos detallado hasta ahora es solamente el comienzo de un análisis bajo la cláusula de comercio en su estado durmiente. Obviamente, si se concluye que está presente alguna de las excepciones antes explicadas, termina el examen constitucional bajo esta cláusula. Si, por el contrario, se concluye que el estado ha ejercido su poder exclusivamente como regulador y no como participante en el mercado ni como parte de un esquema mixto "regulador-participante", y, además, que la regulación no favorece a una entidad pública, pasamos al segundo nivel del análisis. Este nos requiere fijarnos en la <u>intención</u> de la ley impugnada.

Cuando se alega que un acto regulador del estado viola la cláusula de comercio durmiente es necesario determinar si dicho acto discrimina <u>intencionalmente</u> en contra del comercio interestatal,70 ya sea de la faz de su texto <u>o en su aplicación</u>.71 Una ley estatal será discriminatoria de su faz cuando el discrimen contra el comercio interestatal surja expresamente del propio texto de la ley,72 por ejemplo, cuando se establece una tasa contributiva más alta para un comerciante no-residente que para un comerciante local. En estos casos, "no hace falta mirar más allá del texto [del] estatuto para determinar que discrimina contra el comercio interestatal".73 Por otra parte, una ley estatal es discriminatoria en su aplicación, cuando, sin decirlo expresamente, el estatuto está diseñado de tal manera que la aplicación práctica del texto <u>necesariamente discriminará</u> contra el comercio interestatal. Hay, pues, discrimen contra el comercio interestatal cuando la ley establece un trato diferencial basado en criterios aparentemente neutrales que, al aplicarse, producen resultados irremediablemente

---

70 <u>Dep't of Revenue v. Davis</u>, *supra*, p. 338.

71 <u>Maine v. Taylor</u>, *supra*, p. 138. "[O]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect…".

72 <u>United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.</u>, *supra*, p. 338.

73 <u>Camp Newfound/Owatonna v. Town of Harrison</u>, *supra*, p. 576. "It is not necessary to look beyond the text of [the] statute to determine that it discriminates against interstate commerce".

discriminatorios.74 Es decir, no se trata de analizar si la puesta en vigor de una ley en un caso particular produjo un desenlace discriminatorio, sino de si en el texto de la ley hay un esquema diseñado, implícitamente, para que <u>toda aplicación</u> del estatuto conlleve un trato distinto al comercio interestatal. En la jurisdicción federal, cuando el discrimen surge <u>explícitamente del texto</u>, se le conoce como "trato diferencial"; si surge <u>implícitamente del texto</u>, se le conoce como "impacto diferencial".75 Es decir, la primera es de su faz, mientras la segunda es en su aplicación. El análisis requerido no se limita, como sugiere la mayoría, a examinar si la aplicación de la ley, <u>en una circunstancia</u>

---

74 *Véase* <u>Am. Trucking Ass'ns v. Mich</u>, 545 U.S. 429 (2005). Ejemplo de esto podría ser una ley que trate distinto a un comerciante cuyo producto sea enlatado el día antes de su venta en Puerto Rico, frente a otro cuyo producto sea enlatado más de un día antes de su venta. No obstante la adopción de unos criterios aparentemente neutrales, la fecha de enlatado y la de la venta, el primer comerciante <u>necesariamente</u> será local y el segundo tenderá a ser extranjero.

75 <u>Natural Paint & Coatings Ass'n v. City of Chicago</u>, 45 F.3d 1124, 1131 (1995). "State and local laws affecting commerce may be put into one of three categories. The first category comprises laws that <u>explicitly</u> discriminate against interstate commerce. [The city] might, for example, forbid the sale of spray paint manufactured outside [the State]…The second category comprises laws that <u>appear to be neutral</u> among states but <u>bear more heavily</u> on interstate commerce than on local commerce. One state's law setting a 55-foot limit for trailers when all nearby states permit 65-foot trailers bears more heavily on vehicles from other states…The Court treats it as <u>equivalent</u> to a statute discriminating <u>in terms</u>…If the first category may be called disparate treatment, and the second disparate impact, the third category comprises laws that affect commerce without any reallocation among jurisdictions". (Énfasis suplido).

específica, tiene un efecto discriminatorio contra el comercio interestatal. Se requiere, como hemos explicado, que el texto revele un esquema legislativo para establecer un trato discriminatorio al comercio interestatal.

En estos casos, en los que el discrimen se manifiesta en la aplicación de la ley, es importante auscultar la intención legislativa para determinar si se legisló con ánimo discriminatorio.76 Aunque la diferencia pueda ser sutil, no es lo mismo una actuación gubernamental que en determinado contexto produzca un resultado discriminatorio incidental y una ley cuyo texto, aunque no lo manifieste expresamente, tiene un efecto discriminatorio intencional al ser puesto en vigor. Para efectos del análisis bajo la cláusula de comercio, lo que importa es que el trato diferencial discriminatorio esté expreso o implícito en el texto de la ley.

Según el Tribunal Supremo de los Estados Unidos, "una ley discriminatoria es *per se* virtualmente inválida".77 No obstante, el propio Tribunal nos recuerda que la acción gubernamental es válida si "avanza un propósito local legítimo que no puede ser atendido adecuadamente mediante

---

76 Bacchus Imps. v. Dias, *supra*, p. 270.

77 Dep't of Revenue v. Davis, *supra*, p. 338. "A discriminatory law is virtually *per se* invalid…". Véase, además, Camp Newfound/Owatonna v. Town of Harrison, *supra*, p. 575.

alternativas razonables no-discriminatorias".78 Quiere ello decir que si bien en esos casos se aplicará un escrutinio riguroso, no se requiere que el estado demuestre un interés apremiante; bastará con un interés meramente legítimo. Será fundamental demostrar que dicho interés legítimo no puede ser logrado razonablemente sin la acción estatal discriminatoria. De esa forma, la jurisprudencia distingue entre el análisis bajo la cláusula de comercio durmiente y el análisis clásico de escrutinio estricto.

Cuando la ley no resulta discriminatoria de su faz o en su aplicación, se empleará otro escrutinio, llamado el "Pike test".79 Éste postula que la acción gubernamental reguladora del comercio "será validada a menos que la carga impuesta sobre el comercio interestatal sea claramente excesiva con relación a los beneficios locales putativos".80 Se trata de un análisis de balance de intereses que examina la proporcionalidad entre las cargas y beneficios resultantes de la acción estatal. Para invalidar una acción no basta que la ley impugnada afecte al comercio interestatal, ni tampoco basta que imponga una carga sobre dicho comercio; esa carga debe ser "claramente excesiva" con relación al beneficio que

---

78 *Id*. "[I]f it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives".

79 Pike v. Bruce Church, 397 U.S. 137 (1970).
80 (Énfasis suplido) Dep't of Revenue v. Davis, *supra*, pp. 338-339. "Absent discrimination for the forbidden purpose, however, the law will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits".

se pueda obtener.81 Incluso, se ha resuelto que la carga sobre el comercio interestatal debe ser <u>onerosa y opresiva</u>.82 <u>Además</u>, se requiere que la carga excesiva genere, en la práctica, un obstáculo innecesario al comercio interestatal.83 Según el Tribunal Supremo federal, las "leyes estatales frecuentemente sobreviven este escrutinio *Pike*".84 Ciertamente, no toda acción intencionalmente discriminatoria será invalidada, al igual que no toda acción no-discriminatoria sobrevivirá el escrutinio judicial. En el primer caso, la acción intencional se presumirá inválida y el estado deberá demostrar su validez. En el segundo, la acción no discriminatoria se presumirá constitucional y solamente se anulará en casos excepcionales.

En el caso ante nuestra consideración, Northwestern impugna el impuesto establecido por la Ley 95. Por tanto, es necesario analizar con mayor detenimiento la doctrina desarrollada por el Tribunal Supremo de los Estados Unidos sobre el poder de los estados y otras jurisdicciones para imponer contribuciones y su relación con la cláusula de comercio en su estado durmiente. Como correctamente señala

---

81 *Id*, p. 353. "[M]ay be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice".

82 "Undue burden" (<u>GMC v. Tracy</u>, *supra*, n. 12); "Oppressive burdens" (<u>Bacchus Imps. v. Dias</u>, *supra*, p. 272).

83 <u>Maine v. Taylor</u>, *supra*, p. 151. "[N]eedlessly obstruct[s] interstate trade".

84 <u>Dep't of Revenue v. Davis</u>, *supra*, p. 339. "State laws frequently survive this *Pike* scrutiny".

la Opinión mayoritaria, al analizar una medida tributaria local, se analizarán los siguientes factores: (1) si existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la impone; (2) si la contribución está distribuida o proporcionada equitativamente; (3) si la contribución en cuestión no discrimina contra el comercio interestatal y (4) si la contribución está relacionada apropiadamente con los servicios provistos por el estado.[85] También será necesario precisar el enfoque del esquema tributario, el tipo de contribución que se impugna y la alegada naturaleza discriminatoria del mismo.

En el contexto contributivo, "una ley discrimina si impone contribuciones <u>más onerosas</u> sobre una transacción o incidente cuando ésta cruza fronteras estatales que cuando ocurre totalmente dentro del estado".[86] Es decir, se analizará <u>el cobro</u> de la contribución, <u>no el uso</u> del dinero recaudado. En ese sentido, "ningún estado, de manera consistente con la cláusula de comercio, podrá imponer una contribución que discrimine contra el comercio interestatal proveyendo una ventaja comercial directa a los negocios

---

85 Opinión mayoritaria, p. 27.

86 (Énfasis suplido) <u>Fulton Corp. v. Faulkner</u>, 516 R.S. 325, 331 (1996). "With respect to taxation [… a law is discriminatory] if it taxes a transaction or incident <u>more heavily</u> when it crosses state lines than when it occurs entirely within the State".

locales".87 Claro está, si la contribución es parte de un esquema que incluye la participación estatal en el mercado, se ubica fuera de las limitaciones de la cláusula de comercio en su estado durmiente.88 De igual forma, una contribución aparentemente discriminatoria puede ser válida si su objetivo es nivelar la cantidad total de contribuciones que pagará determinado producto.89

Ahora bien, si la imposición de una contribución no está acompañada por una participación estatal en el mercado, la jurisprudencia del Tribunal Supremo de los Estados Unidos distingue, tanto bajo el "*per se rule*" como el "Pike *test*", entre impuestos regulares, subsidios en efectivo, exenciones

---

87 Bacchus Imps. v. Dias, *supra*, p. 268. "[N]o State, consistent with the Commerce Clause, may impose a tax which discriminates against interstate commerce by providing a direct commercial advantage to local business".

88 *Véase* la diferencia entre Dep't of Revenue v. Davis, *supra*, caso en que el Tribunal Supremo de los Estados Unidos validó un esquema contributivo discriminatorio que imponía contribuciones más altas a los intereses producidos por bonos de fuera del estado en contraposición a bonos locales, y Bacchus Imps. v. Dias, *supra*, en el que se invalidó un impuesto más alto al vino proveniente de fuera del estado que al vino producido localmente. En el primer caso, como el Estado también actuaba como participante en el mercado al favorecer sus bonos frente a los bonos extranjeros, la contribución discriminatoria era válida. Ese elemento no estaba presente en el segundo pleito. Igual ocurrió en GMC v. Tracy, *supra*, en el que se dio un tratamiento contributivo preferencial a entidades públicas.

89 A esto se le llama "compensatory tax" y está "diseñado simplemente para hacer que el comercio interestatal asuma un cargo que ya ha sido asumido por el comercio intraestatal". Fulton Corp. v. Faulkner, *supra*, p. 331: "[D]esigned to make interstate commerce bear a burden already borne by intrastate commerce".

contributivas y otras posibles canalizaciones del poder fiscal estatal. <u>No se puede caer en el error de analizar toda imposición contributiva de la misma manera.</u>

La decisión del Tribunal Supremo de los Estados Unidos en <u>Camp Newfound/Owatanna v. Town of Harrison</u>, *supra*, es altamente ilustrativa para el caso de autos. En esa ocasión, el estado excluyó a las entidades que ofrecían servicios principalmente a no-residentes del listado de organizaciones caritativas eximidas de un impuesto estatal sobre la propiedad. De esa forma, al no eximirlas de la contribución, impuso a las organizaciones caritativas interestatales una tasa contributiva mayor que a las locales. Por tanto, el discrimen contra el comercio interestatal era expreso en el texto de la ley, es decir, surgía de su faz, pues el criterio diferencial era la ciudadanía de los receptores del servicio y no era parte de un esquema mixto que incluyera alguna participación estatal en el mercado. De ese modo, se constataba el discrimen al momento de <u>calcular</u> el impuesto.90 Como consecuencia, en vez de aplicarse el "<u>Pike</u> *test*", se empleó el escrutinio riguroso bajo el "*per se rule*". El Tribunal Supremo federal, en una decisión 5-4, resolvió que la exclusión de la exención contributiva limitada a entidades que prestaban servicios a residentes del estado era inválida bajo la cláusula de comercio durmiente. Sin embargo, el propio Tribunal hace hincapié en

---

90 <u>Camp Newfound/Owatanna v. Town of Harrison</u>, *supra*, p. 593: "[A]ssessment and computation of taxes".

que existe una diferencia entre un apoyo a la industria local mediante una tasa contributiva discriminatoria y el subsidio directo a dicha industria proveniente de las arcas del estado.[91]

En New Energy v. Limbach, *supra*, el Tribunal Supremo de los Estados Unidos examinó un crédito contributivo que discriminaba contra el comercio interestatal, en tanto daba trato preferencial a la gasolina producida con etanol, que se producía en el estado. Al igual que en el caso anterior, como el esquema contributivo no era parte de un régimen mixto más amplio que incluyera una participación estatal en el mercado, el Supremo federal concluyó que el crédito era inválido, pues su efecto necesario era imponerle tasas contributivas dispares discriminatorias. Ahora bien, igual que en Camp Newfound/Owatanna v. Town of Harrison, *supra*, el Tribunal manifestó que el resultado sería distinto si se tratase de un programa de subsidio en efectivo.

De lo anterior se desprende la necesidad de hacer unas distinciones importantes al analizar la impugnación de una contribución bajo la cláusula de comercio durmiente. En primer lugar, hay que determinar si estamos ante un esquema

---

91 *Id*, p. 589. "A pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business". Esta expresión es altamente pertinente al caso de autos, pues el propio Tribunal Supremo federal, en casos de expresión gubernamental subsidiada, ha acortado la distancia entre el subsidio que proviene del fondo general y el que se obtiene mediante una contribución especial. Véase, además, *Id*, p. 590. "Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation does".

puramente contributivo o uno que es parte de un régimen mixto que incluye participación estatal en el comercio, en cuyo caso, aplicará la excepción de participante en el mercado. En segundo lugar, hay que ver si se trata de un impuesto directo o una exención contributiva, en contraposición a un programa de subsidio o apoyo económico del estado a la industria local, pues el primero estará sujeto a las limitaciones de la cláusula de comercio en su estado durmiente y el segundo no. Finalmente, hay que precisar si se trata de una contribución cuyo efecto es generar <u>tasas contributivas diferenciales que discriminan contra el comercio interestatal</u>, ya sea producto de su propio texto expreso o como consecuencia de su aplicación, o si, por el contrario, se está cuestionando el uso que se da al ingreso producido por la contribución. Para efectos de la cláusula de comercio en su estado durmiente, <u>solamente el primer escenario será pertinente</u>.

Esto nos trae, nuevamente, al asunto de la diferencia entre una ley que discrimina explícitamente, o "de su faz", contra el comercio interestatal, y una que discrimina implícitamente o "en su aplicación". En <u>West Lynn Creamery, Inc. v Healy</u>,92 el Tribunal Supremo federal resolvió que lo fundamental es si la "operación práctica" del estatuto

---

92 La Opinión mayoritaria, a la página 29, cita al Tribunal Supremo federal en <u>West Lynn Creamery, Inc. v. Haley</u>, 512 U.S. 186, 201 (1994), pero trastoca el significado del texto citado.

produce tasas contributivas discriminatorias.93 Es decir, lo que se requiere no es determinar si el dinero producido por una contribución se utilizó discriminatoriamente en un caso particular, sino si la ley fue diseñada de manera que su aplicación práctica necesariamente establecería un discrimen contra el comercio interestatal. En términos de una ley que impone una contribución, ello quiere decir que el estatuto debe crear una carga tributaria más onerosa contra el comercio interestatal. Reiteramos que, al referirse a la "operación práctica" del estatuto, el Tribunal se refiere a la intención legislativa discriminatoria que está implícita en el texto, en tanto y en cuanto la implantación de lo legislado necesariamente pondrá en vigor un esquema discriminatorio. No obstante, la Opinión mayoritaria llega a la conclusión de que una contribución equitativa es discriminatoria en su aplicación porque una parte de los fondos recaudados se usaron, "en la práctica", para discriminar contra el comercio interestatal. La jurisprudencia federal que analiza casos de contribuciones alegadamente discriminatoria no apoya tal conclusión.

Por último, la jurisprudencia del Tribunal Supremo de los Estados Unidos establece unos requisitos procesales y sustantivos que son altamente relevantes a la controversia

---

93 *Id.* "The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce".

de autos. Incluso, algunos de ellos imposibilitan que se llegue a la conclusión que hoy adopta el Tribunal. En primer lugar, cuando se impugna una acción gubernamental al amparo de la cláusula de comercio en su estado durmiente, hay que darle una oportunidad al Estado, mediante una vista evidenciaria, para presentar prueba para justificar su acción, ya sea bajo el *per se rule* o el Pike *test*". Según el Tribunal Supremo federal, la vista evidenciaria y la producción de un expediente fáctico son el "componente empírico" de dichos escrutinios.94 En su ausencia, no podemos llevar a cabo el escrutinio judicial correspondiente de manera completa. Cuando se presenta por primera vez un argumento de esa naturaleza en el trámite apelativo, como ha sucedido en este caso, lo que procede es devolver el caso al foro de instancia para que reciba la prueba y evalúe los argumentos al respecto.95 En casos bajo el "*per se rule*", dado que el peso de la prueba recae sobre el Estado, hacen falta "determinaciones de hechos basadas en evidencia concreta en el expediente".96

En segundo lugar, debemos estar atentos a los intereses gubernamentales legítimos, sustanciales e, incluso,

---

94 Maine v. Taylor, *supra*, p. 140. "[E]mpirical component of that scrutiny".
95 *Véase* White v. Mass. Council of Contsr. Emplrs., *supra*, n. 12. A igual conclusión se llegó en United Bldg. & Constr. Trades Council v. Camden, *supra*, ante un argumento presentado por primera vez en la etapa apelativa.

96 Granholm v. Heald, *supra*, pp. 493.

apremiantes, como la integridad de los recursos naturales,97 que pueden estar envueltos en controversias de esta naturaleza. Estos, a su vez, están íntimamente relacionados con los poderes de razón de estado de la Asamblea Legislativa.98

En síntesis, la cláusula de comercio en su estado durmiente aplica únicamente en aquellos casos en los que el estado ha actuado exclusivamente en su capacidad como ente regulador. En cuanto a su facultad de imponer contribuciones, la aplicación de la cláusula dependerá de si es parte de un esquema mixto que incluye participación estatal en el mercado. Si la acción gubernamental impugnada es producto de la participación del estado en el mercado o de regulación a favor suyo, al igual que si es parte de un

---

97 Maine v. Taylor, *supra*, p. 151.

98 Am. Trucking Ass'ns v. Michigan, *supra*, p. 414.

esquema mixto, no aplicarán las restricciones de la cláusula de comercio en su estado durmiente. En aquellos casos donde, en efecto, la acción impugnada sea producto de las facultades reguladoras de un gobierno local, el escrutinio a emplearse dependerá de si se trata de una legislación discriminatoria o de una actuación gubernamental neutral que afecta el comercio interestatal. Una ley se considerará discriminatoria si establece un trato diferencial para el comercio interestatal frente al comercio local. Dicho discrimen puede manifestarse de dos maneras: de su faz, es decir, que del texto de la ley surja expresa y abiertamente el discrimen; o en su aplicación, es decir, que la puesta en vigor del texto tendrá un resultado discriminatorio en la práctica. En el caso específico de los impuestos, el discrimen puede ser de su faz, mediante tasas contributivas que abiertamente establecen un trato diferencial entre el comercio interestatal y el comercio local, o en su aplicación, a través de un diseño textual que produce, en la práctica, tasas contributivas discriminatorias.

Una ley promulgada por un estado actuando en su capacidad como ente regulador, que sea discriminatoria tanto de su faz como en su aplicación, estará sujeta al escrutinio riguroso establecido en el "*per se rule*". Bajo este análisis, la ley se presumirá inválida, a menos que el Estado demuestre que ésta avanza un propósito local legítimo que no puede ser atendido adecuadamente mediante alternativas razonables no-discriminatorias. En estos casos

hará falta una vista evidenciaria para que el estado presente prueba que justifique su acción. Por el contrario, si la ley no es discriminatoria, se aplicará el "Pike test". A esos efectos, la ley será válida a menos que la carga impuesta sobre el comercio interestatal sea claramente excesiva con relación a los beneficios locales pretendidos y constituya un obstáculo innecesario al flujo libre del comercio. Se trata de un balance de intereses que tiende a favorecer al estado.

Por último, el que una actuación gubernamental no esté sujeta a un análisis bajo la cláusula de comercio en su estado durmiente o, incluso, sobreviva dicho análisis, no significa el fin de la revisión judicial. Esto es particularmente cierto en casos sobre tasas contributivas. Como explicó el Tribunal Supremo federal en GMC v. Tracy, *supra*, "en algunas circunstancias peculiares, ciertas clasificaciones contributivas que son discriminatorias de su faz contra el comercio interestatal pueden violar la cláusula de igual protección [de las leyes] a pesar de que pasan el cedazo de la cláusula de comercio".99 Evidentemente, un gobierno local, incluso en su rol como participante en el mercado, no puede actuar contrario a

---

99 GMC v. Tracy, *supra*, p. 311. "[I]n some peculiar circumstances[,] state tax classifications facially discriminating against interstate commerce may violate the Equal Protection Clause even when they pass muster under the Commerce Clause".

otras obligaciones constitucionales.100 La jurisprudencia federal ha analizado ataques a leyes económicas estatales que incluyen impugnaciones al amparo de la cláusula de comercio a la vez que otras disposiciones constitucionales. Las más discutidas son la cláusula de igual protección de las leyes y la cláusula de privilegios e inmunidades. En Hughes v. Alexandria Scrap Corp., *supra*, se atacó el programa de compra de chatarra de vehículos de motor tanto bajo la cláusula de comercio en su estado durmiente como al amparo de la cláusula de igual protección de las leyes. En cuanto a ésta, el Tribunal Supremo federal resolvió que la diferenciación entre residentes y no-residentes para efectos de dicho programa no infringía "ningún interés fundamental".101 En particular, dado que se trataba de una clasificación que se refería "únicamente con asuntos económicos", el Tribunal concluyó que ésta "no tiene que ser diseñada para que se ajuste con precisión al propósito legítimo que lo inspira".102

Por otra parte, en United Bldg. & Constr. Trades Concil v. Camden, *supra*, el Tribunal Supremo federal discutió un

_____

100 Por ejemplo, el gobierno de Puerto Rico, como participante en el mercado, no podría decidir comprarle únicamente a negocios que pertenezcan a personas de determinada raza, bajo la prohibición de discrimen que establece nuestra Constitución.

101 Hughes v. Alexandria Scrap Corp., *supra*, p. 813. "[U]pon no fundamental interest".

102 *Id*. "[O]ne dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purpose animating it".

ataque bajo la cláusula de privilegios e inmunidades a una

ordenanza municipal que exigía que el 40% de los

trabajadores en proyectos municipales fuesen residentes de

la ciudad.103 Según el Tribunal:

> La aplicación de la Cláusula de Privilegios e
> Inmunidades a una instancia particular de discrimen
> contra quienes residen fuera del estado conlleva un
> análisis en dos etapas. Como asunto inicial, el
> tribunal debe decidir si la ordenanza establece una
> carga a uno de los privilegios e inmunidades protegidos
> por la Cláusula. No todas las formas de discrimen
> contra ciudadanos de otros Estados son sospechosas
> constitucionalmente.104

En este caso, se consideró el interés de un ciudadano en

conseguir empleo en una obra pública en otro estado. Según

el foro federal, debe determinarse si la protección de ese

interés es "fundamental para la promoción de la armonía

interestatal".105 Una vez se concluye que sí y que se ha

afectado    un    privilegio    o    inmunidad    protegido

constitucionalmente,  se  pasará  a  la  segunda  parte  del

análisis,  que  requiere  determinar  si  existe  una  "razón

---

103 También hubo un ataque bajo la cláusula de comercio en
su estado durmiente pero, al igual que en White v. Mass.
Council of Contrs. Emplrs., *supra*, se resolvió que operaba
la excepción de participante en el mercado que evitaba un
análisis bajo dicha disposición constitucional.

104 United Bldg. & Constr. Trades Council v. Camden,
*supra*, p. 218. "Application of the Privileges and
Immunities Clause to a particular instance of
discrimination against our-of-state residents entails a
two-step inquiry. As an initial matter, the Court must
decide whether the ordinance burdens one of those
privileges and immunities protected by the Clause. Not all
forms of discrimination against citizens of other States
are constitutionally suspect".

105 *Id*. "[F]undamental to the promotion of interstate
harmony".

sustancial para el tratamiento diferencial […] y si el grado de discrimen tiene una relación estrecha [con esa razón]".106  El Tribunal Supremo fue enfático en no admitir un argumento bajo la cláusula de comercio en su estado durmiente con respecto a estos hechos.107 Por eso, concluyó que en "[t]odo análisis bajo la Cláusula de Privilegios e Inmunidades debe darse la consideración debida al principio que los estados deben tener amplia libertad al analizar males locales y prescribir curas apropiadas".108 En este caso particular, ante la ausencia de un expediente probatorio adecuado, el Tribunal no pasó juicio sobre los méritos de la impugnación.109

---

106 *Id*, p. 222. "[S]ubstantial reason for the difference in treatment […] and whether the degree of discrimination bears a close relation to them".

107 *Id*, p. 219. "We decline to transfer mechanically into this context an analysis fashioned to fit the Commerce Clause". La diferencia fundamental entre ambas disposiciones es que la cláusula de comercio protege al comercio interestatal mientras que la cláusula de privilegios e inmunidades protege a los residentes de otros estados. *Id*, p. 220.

108 *Id*, pp. 222-223. "Every inquiry under the Privileges and Immunities Clause must be conducted with due regard for the principle that States should have considerable leeway in analyzing local evils and in prescribing appropriate cures".

109 No obstante, el Tribunal sí enfatizó en los argumentos presentados por el municipio de que la ordenanza era necesaria debido a los serios problemas sociales y económicos enfrentados por la ciudad, aumento en el desempleo, descenso significativo en la población, que la reducción dramática en el número de negocios localizados en la ciudad había impactado el valor de las propiedades y afectaba negativamente la base contributiva de la ciudad. Además, la ciudad alegó que la ordenanza no era innecesariamente amplia, pues solamente reservaba el 40%

III.

En el caso de autos, se impugna el impuesto establecido en la Ley 95 por alegadamente ser discriminatorio. El argumento de Northwestern, que el Tribunal acoge, es que como los fondos recaudados fueron empleados, _parcialmente_, en una campaña que impulsaba la carne de res local, se violó la cláusula de comercio en su estado durmiente al convertir el impuesto en discriminatorio en su aplicación. Como vimos, la normativa vigente no admite esta conclusión.

Un impuesto puede ser discriminatorio bajo la cláusula de comercio en su estado durmiente si produce una tasa contributiva que establece diferencias entre el comercio interestatal y el comercio local. Ello puede surgir del texto expreso de la ley o la aplicación del mismo puede producir dicho resultado. En el caso de autos, el impuesto establecido por la Ley 95 _no es discriminatorio_. Del propio texto del estatuto surge una equivalencia entre las cargas contributivas. La Asamblea Legislativa, consciente precisamente de que no se podía establecer un impuesto universal a importadores y productores debido a la naturaleza de sus productos, optó por imponerle a los primeros un impuesto _por libra importada_ y a los segundos _por animal sacrificado_. La contribución impuesta por libra a los importadores equivale al peso típico de un animal sacrificado por un productor local. Es decir, tanto de su

___

de los puestos a residentes de la ciudad, dejando el 60% para no-residentes. _Id_, p. 222.

faz como en su aplicación, la contribución establecida por la Ley 95 <u>no es discriminatoria</u>. Por tanto, no aplica el análisis del "*per se rule*". Pero, aunque se entendiera que ese es el análisis requerido, <u>el Tribunal tiene la obligación, conforme a los precedentes del Tribunal Supremo de los Estados Unidos, de devolver el caso al foro de instancia para la celebración de un juicio en sus méritos en el que se dé la oportunidad al estado de presentar prueba.</u> En ese caso, el Estado tendrá que demostrar que la medida responde a un interés legítimo suyo, como atender la crisis económica o garantizar el abastecimiento nutricional de la población, y que éste no se puede atender de manera adecuada mediante otra alternativa no-discriminatoria razonable.

Reitero, sin embargo, que, en todo caso, el análisis requerido sería el que corresponde al "<u>Pike</u> *test*", ya que la tasa contributiva no es discriminatoria. La parte demandada no ha ofrecido argumento persuasivo alguno de que la carga contributiva de $0.01 por cada libra de res importada constituya una carga excesiva u onerosa ni tampoco que obstaculiza el comercio interestatal. En ese sentido, aún si se aplicara la cláusula de comercio a los hechos de este caso, no hay duda que la contribución sobrevive el "<u>Pike</u> *test*".

Además, no podemos olvidar que la contribución establecida por la Ley 95 es <u>parte de un esquema más amplio que incluye una participación estatal en el mercado</u>, a través de la campaña publicitaria en la que el estado

difundió <u>su opinión sobre los productos</u>. De la misma manera que el Estado, como participante del mercado, puede decidir cuáles productos comprar y cuáles no comprar, también puede recomendarle al pueblo consumidor cuáles productos comprar y cuáles no.110 Ello es permisible bajo la cláusula de comercio. Lo que no podría hacer el Estado es <u>obligar</u> a la compra de la carne de res local.111 Pero aquí el gobierno no ha hecho eso, pues no ha aprobado reglamentación alguna que obligue al consumo local. Por tanto, al estar ante un esquema mixto que incluye la participación del estado en el mercado, no cabe analizar la Ley 95 bajo la cláusula de comercio en su estado durmiente.

Finalmente, no podemos pasar por alto el hecho de que Northwestern no pagó la contribución durante dos años y medio <u>antes de que se iniciara la campaña</u>. ¿Por qué Northwestern no pagó la contribución si aún no sabía que se llevaría a cabo la campaña que hoy alega justifica su falta

---

110 En estos casos, la participación en el mercado por parte del Estado se da, precisamente, mediante su expresión. "When speech falls within the category of government speech, it is immunized from any meaningful First Amendment free speech scrutiny … The government becomes a "market participant" in the market place of ideas rather than a regulator of that marketplace, analogous to the dormant Commerce Clause immunity of state and local governments when they are market participants". Sheldon Nahmod, "Justice Souter on Government Speech", 2010 B.Y.U.L. Rev. 2097, n. 1 (2010).

111 Para una discusión sobre las diferentes posiciones sobre la excepción del participante en el mercado, particularmente en contraposición al elemento coercitivo de la función reguladora, véase Dan T. Coenen, "Untangling the Market-Participant Exemption to the Dormant Commerce Clause", 88 Mich. L. Rev. 395 (1989).

de pago? Tampoco podemos pasar por alto el hecho de que el Fondo establecido por la Ley 95 es considerablemente mayor que la cantidad de dinero invertido en la campaña impugnada.112 Es decir, que Northwestern, so pretexto de no sufragar dicha campaña, pretende zafarse de su responsabilidad de financiar los demás programas de la Oficina Reglamentadora, incluyendo el 10% separado para el financiamiento de dicha Oficina. Avalar esto es permitir que Northwestern se beneficie de la Ley 95 sin que tenga que aportar un solo centavo.

Entiendo que la mayoría se equivoca al concluir que la cláusula de comercio en su estado durmiente aplica a los hechos de autos y que la contribución es discriminatoria en su aplicación. También se equivoca al no darle al estado la oportunidad de presentar prueba para cumplir con su carga probatoria y al eximir a Northwestern de su obligación legal con el fisco más allá de la campaña impugnada.

IV.

Ahora bien, como adelantáramos, el escrutinio judicial no finaliza al concluir que una acción gubernamental no está sujeta a un análisis bajo la cláusula de comercio en su estado durmiente, o que, de estarlo, lo ha superado. Desde el principio, Northwestern alegó que el uso del dinero

---

112 Recordemos que la deuda de Northwestern asciende a $301,526.28; mientras que el costo de la campaña fue de $279,869.85; y que para el año fiscal 1994-95 el Fondo contaba con $769,575.86.

recaudado al amparo de la Ley 95 en una campaña que favorecía el consumo de la carne de res local violaba su derecho a la libre expresión al obligarle a subsidiar una expresión gubernamental con la que está en desacuerdo y que afecta sus intereses económicos. En efecto, la doctrina de subsidio compelido nos brinda el análisis constitucional correcto que debe aplicarse a los hechos de este caso. Se trata de una doctrina desarrollada, principalmente, por el Tribunal Supremo de los Estados Unidos cuya jurisprudencia examinaremos en detalle.

El derecho constitucional fundamental a la libertad de expresión tiene dos manifestaciones principales: el derecho a expresar nuestros pensamientos libremente y el derecho a permanecer callados cuando no queremos hablar.113 Esta segunda manifestación da lugar a la doctrina de la expresión compelida, que protege al ciudadano del poder del estado para obligar a la expresión. Demás está decir que este tipo de acción estatal es vista con gran suspicacia.114

_____

113 Wooley v. Maynard, 430 U.S. 705, 714 (1977). "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all".

114 Abood v. Detroid Bd. Of Educ., 431 U.S. 209, 234-235 (1977). "[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience, rather than coerced by the State". Por ejemplo, el Tribunal Supremo federal declaró inconstitucional una ley que obliga a un periódico a publicar la contestación de un candidato electivo a un artículo escrito por dicha entidad en el que se le

En este caso, sin embargo, el estado no está obligando a nadie a expresarse. Por el contrario, lo que está haciendo es obligar al subsidio de un mensaje expresado por otro ("subsidio compelido" o "*subsidized speech*"). Por mucho tiempo, las controversias sobre este tipo de acción estatal surgían cuando personas que eran obligadas por ley a pertenecer a ciertas organizaciones, como un colegio de abogados o un sindicato laboral, objetaban que se usaran sus cuotas para expresar mensajes de corte ideológico con los que estaban en desacuerdo. En esos casos, siempre y cuando tal expresión no estuviese relacionada con los fines del grupo, el Tribunal Supremo federal permitío a los miembros objetar aquella parte de su cuota que estaba destinada a dichos mensajes ideológicos.115

En Glickman v. Wileman Bros & Elliott,116 el Tribunal Supremo atendió un ataque constitucional a una ley federal que imponía un impuesto especial a ciertos productores agrícolas como parte de un esquema estatutario amplio que incluía varios programas para impulsar la agricultura, incluyendo el establecimiento de una oficina administrativa para esos efectos y una campaña publicitaria genérica para fomentar el consumo general de los productos. Algunos productores entendieron que la contribución constituía una

---

atacaba. Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241 (1974).

115 *Véase* Abood v. Detroit Bd. of Educ, *supra*; Keller v. State Bar of Cal., 496 U.S. 1 (1990).

116 521 U.S. 457 (1997).

expresión compelida inconstitucional, pues estaban en desacuerdo con el contenido de la campaña publicitaria. El Tribunal Supremo federal validó la ley, al entender que la campaña publicitaria objetada era meramente accesoria al esquema estatutario impugnado.117 Según el alto foro federal, "[t]res características del esquema regulatorio en controversia lo distinguen de otras leyes que hemos determinado que coartan la libertad de expresión protegida por la Primera Enmienda".118 Éstas eran, en primer lugar, que la ley no prohibía que los productores hicieran sus propias campañas publicitarias; en segundo lugar, que no se obligaba a nadie a incurrir en expresión simbólica o real y, finalmente, que no se obligaba a los productores a endosar o financiar ningún punto de vista político o ideológico.119 Según el foro federal, a pesar de que los productores no estaban de acuerdo con el mensaje diseminado por la campaña, "no se puede decir que esto engendre crisis de conciencia alguna".120 Por tanto, el Tribunal Supremo resolvió que el estado puede, como parte de un esquema regulatorio amplio, obligar a un sector a pagar una contribución destinada a financiar una campaña con cuyo contenido difieren.

---

117 Glickman v. Wileman Bros & Elliott, *supra*, p. 469.

118 *Id*, pp. 469-470. "Three characteristics of the regulatory scheme at issue distinguish it from laws that we have found to abridge the freedom of speech protected by the First Amendment".

119 *Id*.

120 *Id*, p. 471. "[C]annot be said to engender any crisis of conscience".

Unos años después, en United States v. United Foods, Inc.,121 al invalidar una ley que obligaba a unos productores de setas pagar una contribución especial para financiar una campaña publicitaria con la que estaban en desacuerdo, el Tribunal restringió el alcance del fallo emitido en Glickman. Resolvió entonces que, como la ley únicamente establecía una campaña publicitaria, sin más, no se justificaba la acción estatal. Es decir, la campaña publicitaria no era parte de un esquema estatutario amplio y, como consecuencia, casi todo el dinero recaudado era para dicha campaña.122

Ahora bien, en Johanns v. Livestock Mktg. Ass'n,123 el Tribunal Supremo examinó la controversia nuevamente y resolvió que la distinción entre Glickman y United Foods no aplica cuando la expresión a cuyo subsidio se compelía era gubernamental.124 En este caso, se retó la "*Beef Promotion and Research Act of 1985*" que "anunciaba una política federal de promover el mercadeo y consumo de la carne de res y productos derivados, usando fondos levantados por un

---

121 533 U.S. 405 (2001).

122 *Id*, p. 411.

123 544 U.S. 550 (2005.

124 *Id*, p. 553. "For the third time in eight years, we consider whether a federal program that finances generic advertising to promote agricultural product violates the First Amendment. In this case, unlike the previous two [Glickman; United Foods], the dispositive question is whether the generic advertising at issue is the Government's own speech and therefor is exempt from First Amendment scrutiny".

impuesto a la venta de ganado y la importación".125 Como

parte del esquema estatutario, se estableció una campaña

publicitaria. Ciertos productores de ganado objetaron la

misma y alegaron que no se les podía imponer una

contribución para financiar un mensaje con el que estaban en

desacuerdo.

En su discusión, el Tribunal Supremo identifica los

diferentes tipos de casos que pueden surgir cuando se

presenta un reto de esta naturaleza a la libertad de

expresión:

> Hemos sostenido retos bajo la Primera Enmienda a
> expresión alegadamente compelida en dos categorías de
> casos: casos verdaderamente de "expresión compelida",
> en los que a un individuo se le obliga a expresar
> personalmente un mensaje con el que está en desacuerdo,
> impuesto por el gobierno; y casos de "subsidio
> compelido", en los que el gobierno le requiere a un
> individuo que subsidie un mensaje con el cual está en
> desacuerdo, expresado por una entidad privada. Hasta
> ahora no habíamos considerado las consecuencias bajo la
> Primera Enmienda del subsidio compelido por el gobierno
> de la expresión del propio gobierno.126

Según el Tribunal Supremo federal, la validez del subsidio

compelido de entidades privadas se sostendrá si la expresión

---

125 *Id*. "[A]nnounces a federal policy of promoting the marketing and consumption of beef and beef products, using funds raised from assessment on cattle sales and importation".

126 (Énfasis suplido) *Id*, p. 556. "We have sustained First Amendment challenges to allegedly compelled expression in two categories of cases: true "compelled speech" cases, in which an individual is obligated to personally express a message he disagrees with, imposed by the government; and "compelled-subsidy" cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity. We have not heretofore considered the First Amendment consequences of government-compelled subsidy of the government's own speech".

subsidiada es germana a los fines del grupo privado o si es parte de un esquema regulatorio amplio.127 Pero, cuando el mensaje a cuyo subsidio se obliga es una expresión gubernamental, no cabe un ataque bajo la Primera Enmienda.128

En Johanns v. Livestock Mktg. Ass'n, los demandantes adelantaron dos argumentos adicionales para sostener que no aplicaba la excepción del subsidio compelido de la expresión gubernamental. Señalaron, en primer lugar, que el Comité encargado de implementar la ley federal y diseñar la campaña publicitaria estaba compuesto tanto por funcionarios públicos como por personas provenientes de la esfera privada. El Tribunal Supremo resolvió que, como los miembros del Comité podían ser removidos por el Secretario de Agricultura y, más importante aun, resultaba evidente que el mensaje que sería diseminado era controlado por el gobierno, no había duda que la campaña constituía una expresión gubernamental. En segundo lugar, los demandantes alegaron que si el gobierno quería hacer una campaña para diseminar

---

127 *Id*, p. 558.

128 *Id*, p. 559.

su expresión, tenía que financiarlo del fondo general del estado, no mediante un impuesto especial a los productores. El Tribunal Supremo rechazó ese argumento: "El análisis de subsidio compelido no se ve afectado en nada porque los fondos para la promoción provengan de impuestos generales o mediante una contribución especial".129 Esta conclusión es fundamental, sobre todo al considerar que en un análisis bajo la cláusula de comercio en su estado durmiente, el Tribunal Supremo ha resuelto que se permite el subsidio directo del gobierno de la empresa privada local, independientemente de si los fondos usados provienen de las contribuciones generales o de un impuesto especial. Es decir, en ambos casos, bajo el análisis de subsidio compelido al igual que bajo el análisis de cláusula de comercio durmiente, no importa si la acción gubernamental de apoyar a la empresa local es financiada por el fondo general del estado o por un impuesto especial a determinada industria.

Resulta evidente que el caso que controla la controversia ante nuestra consideración es Johanns v. Livestock Mktg. Ass'n. La campaña realizada por la Oficina Reglamentadora, organismo evidentemente gubernamental, al amparo de la Ley 95 constituye una expresión gubernamental legítima para adelantar la política pública de promover el

---

129 (Énfasis en original) Id, p. 562. "The compelled-subsidy analysis is altogether unaffected by whether the funds for the promotions are raised by general taxes or through targeted assessment".

consumo de la carne de res, enfatizando en la carne de res local. Por tanto, la contribución establecida por la Ley 95 constituye igualmente un subsidio compelido de una expresión gubernamental que no está sujeta a las restricciones del derecho a la libre expresión. Incluso, de entenderse que aplica la línea de casos de Glickman y United Foods, no cabe duda que la Ley 95 es un esquema estatutario amplio que no se limita únicamente al financiamiento de una campaña publicitaria, pues solamente una porción minoritaria de los fondos recaudados han sido utilizados en ésta y la Ley establece otros programas para impulsar la política pública. Por tanto, aplicaría la doctrina establecida en Glickman. Indudablemente, es forzosa la conclusión de que el impuesto establecido por la Ley 95 es constitucional.

No toda expresión gubernamental es necesariamente constitucional y el estado no puede, mediante su expresión, violentar otras disposiciones constitucionales. Ahora bien, dado que Northwestern no hizo alegación alguna de igual protección de las leyes o bajo la cláusula de privilegios e inmunidades, no nos embarcaremos en un análisis en esa dirección. De todos modos, el tipo de clasificación involucrado en esta controversia solamente requiere un análisis de razonabilidad y nada en el expediente nos permite cuestionar la presunción de constitucionalidad que tienen las leyes impugnadas.

Por lo anteriormente expuesto, disiento enfáticamente de la Opinión del Tribunal. Espero que en el futuro este Tribunal tenga la oportunidad de considerar nuevamente este tema, pues esta decisión no es sólo errada en derecho, sino que su única consecuencia práctica es restringir innecesariamente el poder de nuestra legislatura para desarrollar nuestra economía en beneficio del pueblo.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Estado Libre Asociado de Puerto Rico y el Secretario del Departamento de Hacienda<br><br>Recurridos<br><br>v.<br><br>Northwestern Selecta, Inc.<br><br>Peticionaria | CC-2009-1091 |
|---|---|

Opinión concurrente y disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 27 de marzo de 2012

Nos corresponde determinar la constitucionalidad de una ley que le impone a una parte la obligación de contribuir a una campaña publicitaria que es contraria a sus intereses económicos. Por entender que el asunto ante nuestra consideración es uno que versa sobre libertad de expresión en su variante de expresión compelida, concurro con el resultado pero disiento enérgicamente de sus fundamentos. Entiendo que se equivoca la mayoría de este Tribunal al disponer de la controversia afirmando que la ley en cuestión es inconstitucional por violar la cláusula de comercio de Estados Unidos en su estado durmiente, Entiendo Veamos.

I

El Estado Libre Asociado, a través del Secretario de Hacienda, instó una acción en cobro de dinero contra Northwestern Selecta, Inc. Indicó que la parte demandada era un importador de carne de res y como tal estaba

obligado por la Ley Núm. 95 de 1992, *infra*, (Ley 95). Dicha ley establecía que los importadores de carne debían satisfacer la suma de un centavo de dólar ($0.01) por cada libra de carne importada mientras que los productores pagarían cuatro dólares con catorce centavos ($4.14) por res sacrificada en matadero y un dólar ($1.00) por ternero sacrificado en matadero. La contribución estaba destinada al Fondo para el Fomento de la Industria de la Carne de Res, un fondo especial que tendría a cargo la promoción de dicha industria. En este sentido el Estado adujo, en síntesis, que Northwestern Selecta, Inc. no había cumplido con dicha obligación y que, por tanto, le debía la suma de $301,526.28 en concepto de aportaciones vencidas y no pagadas.

Por otra parte, Northwestern Selecta argumentó, entre otras cosas, que la aportación exigida por la Ley 95, *infra*, era inconstitucional en su aplicación toda vez que violaba su derecho a libertad de expresión y a la libre asociación. Sostuvo que dicha disposición le obligaba solventar una campaña publicitaria contraria a sus intereses económicos dado que la ésta estaba dirigida, según se alegó, a promocionar únicamente la carne de res del País.

Luego de varios incidentes procesales, el Tribunal de Primera Instancia sostuvo que la Ley 95, *infra*, era constitucional de su faz y de su aplicación. Expresó que el hecho de que se destinara una porción de los dineros

recaudados a una campaña de publicidad de la carne de Res del País no intervenía de forma irrazonable con el derecho a la libertad de expresión y asociación del demandado. En consecuencia, declaró con lugar la demanda en cobro de dinero y ordenó a la peticionaria pagar la suma adeudada más los intereses legales desde la fecha de la Sentencia.

Inconforme, la peticionaria acudió al Tribunal de Apelaciones. Allí expresó básicamente lo mismo expresado en el foro primario. Sostuvo que la Ley 95, *infra*, le obligaba a difundir el mensaje comercial de su competencia y que, por tanto, no procedía el cobro de dinero. Sin embargo, planteó por vez primera que la mencionada Ley contravenía la cláusula de comercio interestatal de la Constitución de Estados Unidos dado que tenía el efecto de discriminar contra los importadores de carne de res. El Tribunal de Apelaciones confirmó la Sentencia apelada.

Como cuestión de umbral debo señalar que el planteamiento de la peticionaria en cuanto a que la Ley 95 viola la cláusula de comercio de la Constitución de los Estados Unidos en su estado durmiente se trajo por primera vez en la apelación presentada ante el Tribunal de Apelaciones. Es por ello que el foro intermedio se rehusó a considerarlo en la etapa apelativa.

Inconteste con la determinación del foro *a quo*, recurren ante este Tribunal.130

---

130 Adujo los siguientes señalamientos de error:
  1. Erró el honorable tribunal de apelaciones al determinar que la intención legislativa de la

Luego de analizado el esquema establecido por la Ley 95,

*infra*, entiendo, a diferencia del criterio mayoritario,

que el mismo viola el derecho a la libre expresión de la

peticionaria y no la cláusula de comercio de la

Constitución de los Estados Unidos en su estado durmiente;

asunto que no está válidamente ante nuestra consideración.

Pasemos a ver.

II

A

---

derogada ley 95, según implantada, no era promocionar la carne de res del país para contrarrestar el efecto negativo ocasionado por las importaciones de carne a puerto rico. El tribunal basó su determinación en el texto escrito de la ley núm. 95; no en su historial legislativo ni en su aplicación.

2. Erró el honorable tribunal de apelaciones al determinar que, al aplicar la derogada ley 95, no se violaron derechos a la libre asociación y expresión de los importadores. Aunque toda la evidencia en autos demuestra lo contrario, el tribunal apelativo determinó sumariamente que la promoción realizada a favor de la carne de res del país era de naturaleza informativa y/o educativa sobre la industria en general.

3. Erró el honorable tribunal de apelaciones al negarse a considerar que la aportación ordenada por el tribunal de primera instancia viola la cláusula de comercio interestatal de la constitución de los estados unidos en su "estado durmiente".

4. Erró el honorable tribunal de apelaciones al determinar que la ley núm. 238 provee para que cualquier dinero aportado por los importadores a partir del 18 de septiembre de 1996 sea asignado exclusivamente al fondo establecido para el sector de la carne de res local, y sea utilizado para adelantar la competencia en contra de los importadores.

5.

La Ley 95 de 29 de noviembre de 1992, Ley para crear la Oficina de Reglamentación y Promoción de la Industria de la Carne de Res; para crear el Fondo para la Industria de la Carne de Res, la Junta Administrativa y establecer sus facultades, e imponer violaciones a esta ley, 5 L.P.R.A. sec. 3001-3012 (2005) (Ley 95), se promulgó para promover la industria de la carne de res en nuestro País. Esto, dado la importancia de dicha carne en la dieta de la ciudadanía. La legislación tenía como norte beneficiar a los productores e importadores por lo cual se buscó expandir el mercado a través de la promoción de su consumo. *Véase* Exposición de motivos de la Ley 95, *ante*.

Así las cosas se crearon la Oficina para la Reglamentación y Promoción de la Industria de la Carne de Res (Oficina) y el Fondo para el Fomento de la Industria de la Carne de Res (Fondo). La Oficina tendría como fin promover el consumo, la producción, el mercadeo de la carne de res producida localmente como la importada y ofrecer asesoramiento técnico a importadores y productores. La Oficina recibiría el diez por ciento (10%) de los dineros recaudados por el Fondo para así operar y cumplir con sus fines y propósitos. 5 L.P.R.A. 3002-3003.

Por otro lado, el Fondo se utilizaría para la promoción de la producción, venta, elaboración y consumo de la carne de res tanto la importada como la producida en el País. Para su operación se requeriría que tanto los productores como los importadores aportaran al mismo.

Así, los importadores pagarían un centavo ($0.01) por libra de carne de res importada y los productores pagarían cuatro dólares con catorce centavos ($4.14) y un dólar ($1.00) por res y ternero sacrificado en matadero, respectivamente. 5 L.P.R.A. 3008. El encargado del matadero estaría a cargo de cobrar la aportación y debería remitirla al Secretario de Hacienda dentro de un tiempo determinado. En cuanto a los importadores se facultó al Secretario de Hacienda a cobrar las aportaciones.

La Ley 95 se hizo efectiva sesenta (60) días después de su aprobación y estuvo vigente hasta el 1 de enero de 1997, momento en que entró en vigor la Ley Número 238 de 18 de septiembre de 1997, Ley para crear el Ordenamiento de las Industrias Agropecuarias de Puerto Rico (Ley 238). 5 L.P.R.A. 3051-3061 (2005). La finalidad de la misma no era otra que crear un nuevo ordenamiento administrativo que permitiera regular el sector agropecuario. Asimismo dispuso que cada sector o grupo de sectores debería crear un fondo para promover el desarrollo y comercialización de sus productos. El fondo estaría alimentado por las aportaciones de cada sector o grupo de sectores que lo compusiese, determinados por la junta administrativa. Además, en lo que a esta controversia respecta la Ley 238 derogó a la Ley 95, por lo cual no hay dudas de que esta nueva ley estaba destinada a promover la industria de la carne de res local. De igual manera dispuso para la reasignación de los programas relacionados por lo cual la

Oficina bajo la extinta Ley 95 pasó a estar adscrita a la Oficina de Ordenamiento de las Industrias Agropecuarias. Se ordenó, también, al Secretario transferir las asignaciones presupuestarias al nuevo fondo creado.

B

Nuestra Ley Suprema establece que "[n]o se aprobará ley alguna que restringa la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios". Artículo II sec. 4, Constitución de Puerto Rico, 1 L.P.R.A. sec. 4 (2008). Análogamente la Constitución de Estados Unidos dispone que "[e]l Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohíba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar al Gobierno la reparación de agravios". Enmienda Primera, Constitución de Estados Unidos, 1 L.P.R.A. Emda. Art. I, pág. 181 (2008).

La libertad de expresión "se trata de uno de los derechos a los cuales le hemos reconocido mayor jerarquía en nuestro ordenamiento constitucional, estamos obligados a su más celosa protección". *Muñiz v. Admor. Deporte Hípico*, 156 D.P.R. 18 (2002). Asimismo, dispusimos que "[l]a libertad de expresión es la quinta esencia de una sociedad democrática. De forma multidimensional, en la constelación de valores democráticos, goza de una

supremacía peculiar…". *Asociación de Maestros v. Srio de Educación*, 156 D.P.R. 754 (2002).

Esta garantía constitucional tiene una doble dimensión: por un lado, le garantiza al ciudadano que el Estado no intervendrá con su derecho a expresarse; por otro lado, le prohíbe al Estado obligarlo a exponer, manifestar o adoptar expresiones gubernamentales con las que no está de acuerdo. Esta última dimensión se conoce en la doctrina federal como "expresión compelida" y puede considerarse la dimensión negativa de la Primera Enmienda. *Véase*, David B. Gaebler, *First Amendment Protection Against Government Compelled Expression and Association*, 23 Boston College L. R. 995 (1982).

Como señalara en la Opinión disidente que emitiera en *E.L.A. v. Supermercados Amigo*, 170 D.P.R. 459 (2007), la primera vez que el Tribunal Supremo federal se enfrentó a este aspecto negativo de la Primera Enmienda fue en *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). Este caso se trataba de unos miembros de la congregación Testigos de Jehová quienes se rehusaban a saludar la bandera y a recitar el juramento de fidelidad a Estados Unidos. El Tribunal resolvió que el Gobierno no podía obligarlos a así hacerlo toda vez que dicha obligación era contraria a la Primera y a la Decimocuarta Enmienda de la Constitución. Si bien esta decisión introdujo al ordenamiento el aspecto negativo de la

Primera Enmienda no estableció su alcance. *Gaebler*, *ante*, en la pág. 998.

No fue hasta en *Wooley v. Maynard,* 430 U.S. 705 (1977) que el Tribunal Supremo se enfrentó nuevamente a este asunto. En este caso se retó la constitucionalidad de una ley del estado de New Hampshire que tipifica como delito mutilar el eslogan del estado *Live Free or Die*. Una vez más, al igual que en *West Virginia*, el más Alto Foro federal encontró que lo anterior violaba la Primera Enmienda en su aspecto negativo.

Ese mismo año, el Tribunal Supremo encontró que el obligar a unos maestros no sindicados a pagar la totalidad de una cuota de sindicación a la unión atentaba contra el aspecto negativo de la Primera Enmienda si el uso de las cuotas era utilizado para patrocinar expresiones políticas con las que éstos no estaban de acuerdo y que no tenían relación con la negociación colectiva. *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). En este caso, a diferencia de los anteriores, el Tribunal Supremo tuvo la oportunidad de analizar la doctrina de subsidio compelido. Así, estableció lo que se conoce como "estándar de pertinencia" para establecer cuándo un mensaje puede ser subvencionado por un subsidio compelido sin ofender la Primera Enmienda. Bajo estos parámetros un mensaje subsidiado compelidamente será válido si: 1) el mensaje está relacionado a los objetivos y propósitos del grupo; 2) no tiene carácter político o ideológico.

En *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980), Pruneyard apeló un decisión del Tribunal Supremo de California que estableció que el centro comercial no podía prohibir a un grupo de ciudadanos repartir literatura y recoger firmas en contra de una resolución de la Organización de las Naciones Unidas repudiando al sionismo. El centro comercial argumentó que al así resolver el Tribunal Supremo de California le obligó a utilizar su propiedad para actividades con las cuales no estaba de acuerdo. El Tribunal Supremo de Estados Unidos señaló que dada la característica pública del centro comercial la distribución de literatura y la recolección de firmas no implicaban expresión compelida por parte de los dueños del mismo.

En el 1990 el Tribunal elaboró el estándar de pertinencia establecido en *Abood*. De esta manera invalidó un programa de cuotas obligatorias destinadas a subvencionar expresiones ideológicas y políticas que nada tenían que ver con los objetivos de la colegiación compulsoria del estado de California. *Keller v. State Bar of California*, 496 U.S. 1 (1990).

En nuestra jurisdicción adoptamos el análisis de *Abood* en *Colegio de Abogados de P.R. v. Schneider*, 112 D.P.R. 540 (1982). Aún cuando sostuvimos la constitucionalidad de la colegiación compulsoria, resolvimos que el Colegio de Abogados no podía utilizar los dineros recolectados por las cuotas para subsidiar

expresiones con las que un colegiado no estuviese de acuerdo.

Ulteriormente, los parámetros desarrollados jurisprudencialmente por el Tribunal Supremo de Estados Unidos se aplicaron a controversias donde estaban en disputa aportaciones económicas compulsorias establecidas mediante reglamentación y que estaban destinadas a financiar campañas publicitarias genéricas, entendidas como aquellas destinadas a la promoción de un producto agropecuario. En este contexto son fundamentales dos decisiones de dicha Curia: *Glickman v. Wileman Brothers & Elliot, Inc.*, 521 U.S. 457 (1997) y *United States v. United Foods, Inc.*, 533 U.S. 405 (2001).

En *Glickman* el Tribunal Supremo resolvió que cierta reglamentación que obligaba a los agricultores que cosechaban árboles frutales como a quienes procesaban las mismas a contribuir a una campaña publicitaria genérica no violaba la Primera Enmienda. Esto, toda vez que se trataba de una legislación de carácter económico que regulaba amplia e intensamente el mercado y estaba destinada a proveer estabilidad al mismo.

En *United Foods*, el Tribunal llegó a la conclusión opuesta. Así, fundamentándose en *Abood y Glickman*, sostuvo que obligar a los productores de setas de marca a subvencionar una campaña publicitaria genérica de setas infringía el derecho de éstos a la libertad de expresión. Lo anterior dado a que la campaña publicitaria estaba

dirigida a promocionar las setas genéricas y esto era contrario a los intereses económicos de los productores de marca. El Tribunal expresó que en este caso la reglamentación, a diferencia de *Glickman*, no era una amplia y extensiva. Contrario a lo anterior era una cuyo su fin mismo estaba en la campaña publicitaria. Conviene decir que la protección de la Primera Enmienda no sólo se extiende a aquellas expresiones de carácter político o ideológico. En este caso, lo pertinente es preguntarse si el la subvención de una expresión adelante un fin legítimo el Estado, reglamentado en la legislación en cuestión.

Posteriormente, el Tribunal Supremo tuvo la oportunidad de elaborar sobre los subsidios compelidos de expresión gubernamental. En *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005) el Alto Foro federal sostuvo que el subsidio compelido de expresión gubernamental no ofende de por sí los derechos garantizados bajo la Primera Enmienda. Lo anterior, principalmente porque los dineros recaudados por el Estado siempre se utilizarán para promover la política pública gubernamental. *Id*. 563-564. En este sentido sostuvo que un impuesto a la venta e importación de carne de res destinado a costear, entre otras cosas, campañas publicitarias constituía una expresión gubernamental legítima y por tanto era improcedente su impugnación bajo la Primera Enmienda. Expresó que al estar el mensaje controlado en todas sus etapas por el Gobierno Federal no

podía haber duda de que se trataba de expresión gubernamental. *Id*. 560-561. Así es que el gobierno puede expresarse en pos de su política pública aún cuando reciba recursos de fondos privados. Ahora bien, el mensaje gubernamental no estará sujeto al escrutinio de la Primera Enmienda siempre que sea controlado por el gobierno en su totalidad. *Pleasant Grove City v. Summun*, 555 U.S. 460, en la pág. 468.

## III

Como estableciera al comienzo de esta discusión, la peticionaria argumenta que la derogada Ley 95, *ante*, infringía su derecho a la libertad de expresión toda vez que le compelía a aportar económicamente a una campaña publicitaria contraria a sus intereses económicos. Por su parte, el Estado Libre Asociado sostiene que esta controversia no versa sobre expresión privada compelida, sino sobre el requerimiento de una aportación económica impuesta por la Asamblea Legislativa sobre actividad ampliamente regulada que a su vez se utilizó parcialmente para financiar una expresión gubernamental legítima.

Esta controversia es idéntica a la que tuvimos ante nuestra consideración en *E.L.A. v. Supermercados Amigo*, *ante*. En aquella oportunidad, por estar igualmente dividido el Tribunal, se confirmó la determinación del Tribunal de Apelaciones. Este Tribunal resolvió que la referida Ley 95 era constitucional de su faz y que ésta perseguía un fin legítimo gubernamental que no era otro

que promover el bienestar de la ciudadanía mediante una nutrición adecuada. *Supermercados Amigo*, a*nte*, en la pág. 459.

En aquel momento emití una Opinión disidente que se basó en un doble análisis. Primeramente, se atendió el asunto de si el mensaje objetado por la peticionaria constituía o no una expresión gubernamental. Así, expresé que anteriormente este Tribunal se había manifestado sobre el poder que tiene el gobierno para expresarse y su deber de informar a la ciudadanía de asuntos vitales para el País. De esta manera, recordamos a *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995) y *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368 (1984) para señalar que el deber de informar está íntimamente relacionado al poder que le asiste al ciudadano para fiscalizar la obra gubernamental. Sin embargo, también afirmé que en *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994) que ésta Curia ha sido enfática al rechazar el argumento de que al gobierno le asiste un derecho constitucional a expresarse para informar a la ciudadanía sobre la gestión gubernamental.

Además, sostuve que la expresión gubernamental es un corolario del deber de informar. En este sentido, entendí en aquel entonces que para poder informar responsablemente el gobierno debe participar en el "mercado de las ideas". Este último es piedra angular de cualquier sociedad democrática y la participación del gobierno en el mismo contribuye a la transparencia, por un lado, y a la

fiscalización ciudadana, por el otro. Ahora bien, el mensaje gubernamental -salvo cuando proviene efectivamente del gobierno y está estrechamente vinculado a la gestión gubernamental- no puede lesionar el derecho a no expresarse de aquel que entiende que el mensaje que se lleva es contrario a sus intereses.

En esta controversia, al igual que la de *Supermercados Amigo*, el mensaje objetado no parece estar estrechamente relacionado a la gestión gubernamental. Por el contrario, se trata más bien de una campaña publicitaria sufragada con dineros de un fondo que claramente estaba destinada a promover la industria de carne de res del País. Consta en los autos copia del diseño de dicha campaña como así también de los anuncios publicados en diferentes medios de prensa escrita. Dichos anuncios son suscritos por el Fondo de Fomento Industria Carne de Res y "Carne Fresca del País". Es fundamental que a la hora de determinar si un mensaje proviene o no del Estado auscultar quién es su emisor. Lo anterior, principalmente, porque si por algo es que los mensajes gubernamentales no están sujetos a impugnación bajo la Primera Enmienda es porque el proceso democrático mismo se encarga de refrendarlos o no. En este sentido, para que el electorado pueda decidir si está de acuerdo o no con determinado mensaje gubernamental es imprescindible que sepa que viene del gobierno. En el caso ante nuestra consideración es muy difícil para la ciudadanía determinar

quién era el emisor del mensaje. De igual manera, sería un absurdo pensar que los importadores de carne de res por sí mismos tuviesen la capacidad de movilizar a la ciudadanía para que desautorice un mensaje gubernamental sufragado con su dinero y que es lesivo a los intereses económicos de éstos.

A diferencia de la Opinión disidente de la Jueza Asociada, señora Fiol Matta, soy del criterio de que lo expresado en la Ley 95 no constituye un mensaje gubernamental y es, más bien, una expresión comercial sufragada con fondos privados. Es por ello que me reafirmo en lo que dije en *Supermercados Amigo* en cuanto a que a este tipo de mensaje no está cobijado por la doctrina de expresión gubernamental. Por lo cual no le asiste la razón al Estado en cuanto a este planteamiento.

Una vez determinado que la expresión estatal contenida en la Ley 95 no podría entenderse como expresión gubernamental pasé a considerar el argumento sobre si se trataba la industria de la carne de res de una altamente reglamentada, según adujo el Estado. Análogamente, el Estado también invoca en este caso que esta industria se trata de una actividad comercial ampliamente regulada y que, por tanto, podía imponer impuestos a la misma. Sostiene que debemos basar nuestra determinación en lo expresado por el Tribunal Supremo federal en *United Food, ante* y en *Glickman, ante*. Me sostengo en el criterio de que el Estado confunde qué es lo que constituye una

industria "ampliamente" regulada. Es claro que la extinta Ley 95 sólo buscaba promover la industria de la carne de res en Puerto Rico. Nada dice el texto de ésta sobre control de precios, imposición de cuotas u otra disposición semejante. En este sentido, no se puede entender que la industria de carne de res en la Isla es una altamente reglamentada, máxime cuando no hay precios uniformes ni algún otro tipo de restricción o se manifiesta la búsqueda de estabilidad en el mercado.

Así las cosas, soy del criterio que bajo la Constitución del Estado Libre Asociado de Puerto Rico, la derogada Ley 95 infringió el derecho a la libertad de expresión de la peticionaria. Concluyo así, dado que no hay dudas de que los fondos utilizados para promover la carne fresca del País provenían del Fondo establecido por la misma y al cual tanto los productores como los importadores estaban obligados a aportar. De los documentos anejados en los autos se desprende que si bien el texto legal estableció que se realizaría una campaña publicitaria genérica, esto no fue lo que sucedió. La campaña de mercadeo y publicidad sólo promocionó la carne de res producida en el País y por tanto contrarió los intereses económicos de la aquí peticionaria. Asimismo, soy del criterio de que no existe interés legítimo del Estado que justifique exigirle a la peticionaria financiar una campaña publicitaria que va en detrimento de sus intereses comerciales.

Una vez más diré que el gobierno no puede, sin lacerar el derecho a la libertad de expresión de un competidor, compeler a una parte a sufragar una acción gubernamental que es claramente favorable a la competencia. Hacerlo constituye una clara violación de derechos fundamentales básicos habidos y garantizados constitucionalmente en un gobierno democrático.

IV

La atención forzada y equivocada de la mayoría de este Tribunal en este caso me obliga a unas últimas palabras a modo de epílogo.

A

Es norma de autolimitación judicial la que establece que un tribunal apelativo no considerará planteamientos sobre los cuales el foro primario no ha tenido oportunidad de expresarse. *Misión Industrial de Puerto Rico v. Junta de Planificación*, 146 D.P.R. 64, 145 (1998); *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340 (1990). Aunque hemos sostenido que dicha doctrina no es una inquebrantable, *Santiago Cruz v. Hernández Andino*, 91 D.P.R. 709 (1965), el acoger planteamientos no expresados ante el tribunal inferior descansa en nuestra sana discreción y está estrechamente relacionado a nuestra obligación de impartir justicia. *Vega v. Yiyi Motors, Inc.*, 146 D.P.R. 373 (1998). De igual manera, no puede ser un fundamento para no atender los casos en los méritos el hecho que se varíe la teoría del caso a nivel

apelativo. *Santiago Cruz v. Hernández Andino, supra.* Pero este caso no trata de esta situación.

De los hechos habidos en los autos de este caso queda diáfanamente establecido que entrar a dirimir si la cláusula de comercio interestatal en su aspecto durmiente es aplicable a Puerto Rico es, **jurídicamente**, innecesario. La controversia ante nuestra consideración no requiere que quebrantemos los principios que hemos establecido y reafirmado con el pasar de los años. No estamos ante un caso donde de no aplicar una teoría que el tribunal de instancia no tuvo la oportunidad de considerar redunde en un fracaso de la justicia. Tampoco nos hallamos en uno de esos momentos en que, de no acoger argumentos presentados por primera vez en el foro apelativo, estaríamos abdicando a nuestra función principalísima: impartir justicia.

Soy del criterio de que este caso pudo ser dispuesto atendiendo el segundo señalamiento de error que sí estuvo ante la consideración del foro primario. Es por eso que, a diferencia de la mayoría de los miembros de este Tribunal, entiendo que no incidió el foro intermedio al no considerar los argumentos presentados por la peticionaria en cuanto a que la derogada Ley 95, *ante*, es inconstitucional por violar la cláusula de comercio interestatal en su aspecto durmiente.

B

Para entender por qué la cláusula de comercio interestatal de la Constitución de Estados Unidos en su

estado durmiente no aplica a Puerto Rico, conviene hacer un breve recuento histórico. La respuesta a este interrogante está en la genealogía de la relación entre Puerto Rico y Estados Unidos y su desarrollo a través del tiempo. Veamos.

El 10 de diciembre de 1898 se firmó en París el Tratado de Paz entre Los Estados Unidos de América y El Reino de España (Tratado de París) en virtud del cual se puso fin a la Guerra Hispanoamericana. Mediante éste España cedió a Estados Unidos la Isla de Puerto Rico, entre otras. Artículo III del *Tratado de París de 1898*, 1 L.P.R.A. págs.. 16-23 (2008). De esta manera, Puerto Rico se convirtió en un territorio no incorporado de Estados Unidos regulado bajo la cláusula territorial. Esta última, expresamente dispone que:

> El Congreso podrá disponer de, o promulgar todas las reglas y reglamentos necesarios en relación con, el territorio o cualquier propiedad perteneciente a los Estados Unidos.

Art. IV, sec. 3, Const. de Estados Unidos, 1 L.P.R.A. pág. 177 (2008).

Sin embargo, lo anterior no implicó de forma alguna que Puerto Rico pudiera considerarse parte integral de la nación Americana bajo una organización política similar a los estados de Estados Unidos. *Véase Carta Orgánica de 1900 conocida como Ley Foraker; además véanse*, *De Lima v. Bidwell*, 182 U.S. 1 (1901)(Puerto Rico es un territorio de Estados Unidos); *Downes v. Bidwell*, 182 U.S. 244 (1901)(La

Constitución de Estados Unidos no se extiende a los territorios no incorporados); *Dooley v. United States*, 182 U.S. 222 (Reafirmando *De Lima, ante.*); *conocidos como los Casos Insulares*.

El 2 de marzo de 1917 el Congreso de los Estados Unidos aprobó la Ley Orgánica Jones. Ésta tenía como fin principal instaurar un gobierno civil en la Isla y las islas adyacentes y regir la relación entre éstas y la metrópolis. Igualmente, otorgó la ciudadanía estadounidense a los habitantes de Puerto Rico y les concedió una carta de derechos. Asimismo, autorizó a la Legislatura de Puerto Rico a imponer contribuciones, dentro de ciertos límites, y estableció que la cláusula de comercio interestatal no aplicaba a la Isla, entre otras disposiciones. *Véase*, Ley de Relaciones Federales, 1 L.P.R.A. págs. 220-261 (2008).

A pesar de la instauración del gobierno civil, el Tribunal Supremo de Estados Unidos dejó claro que la concesión de la ciudadanía no tuvo el efecto de incorporar a Puerto Rico a los Estados Unidos. *Véase*, Antonio Fernós Isern*, Estado Libre Asociado de Puerto Rico, Centro de Investigaciones Sociales*, 1988, en las págs. 32-35. Por lo cual, Puerto Rico continuó con el distintivo de ser un territorio no incorporado y por tanto distinguible de los estados federados.

No fue hasta el año 1947 que el Congreso de Estados Unidos le confirió a la Isla el poder para escoger su

propio gobernador. *Véase* Raúl Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, v. 1, 1997, en las 479-80. Posteriormente, el 3 de julio de 1950, se aprobó la Ley Pública 600, Ley de 3 de julio de 1950, cap. 446, 64 Stat. 314, mediante la cual el Congreso autorizó que Puerto Rico organizara su propio gobierno bajo la adopción de su propia Constitución. Esta Ley dispuso que la Ley Jones o Ley de Relaciones Federales con Puerto Rico continuaría en vigor a excepción de ciertas disposiciones contenidas en el artículo 5 de la misma. Asimismo estableció que debía ser aprobada en un referéndum y de éste contar con el apoyo mayoritario de los puertorriqueños la Asamblea Legislativa quedaría investida para convocar una convención constituyente encargada de redactar una Constitución para Puerto Rico.

Así las cosas, el pueblo puertorriqueño aprobó en referéndum abrumadoramente el texto constitucional redactado por la Asamblea Constituyente y el 25 de julio de 1952 entró en vigor la Constitución del Estado Libre Asociado de Puerto Rico. Este pacto entre Estados Unidos y Puerto Rico le confirió autonomía al gobierno local en cuanto a sus propios asuntos, haciendo innecesaria entonces la intervención del Congreso bajo la cláusula territorial como había sido hasta el momento. De igual manera, esta nueva forma de relación política entre Estados Unidos y Puerto Rico no convirtió al Estado Libre Asociado en un estado de la Unión ni tampoco tuvo el

efecto de hacerle parte integral de la misma como lo es un territorio incorporado.

La fundación del Estado Libre Asociado conllevó, necesariamente, "un salto cualitativo significativo e importante en gobierno propio para Puerto rico." R. Hernández Colón, J. Hernández Mayoral, P. Hernández Rivera, *Hacia La Meta Final*, Editorial Calle Sol, San Juan, pág. 7. El efecto real del pacto ofrecido por Estados Unidos y aceptado por el pueblo de Puerto Rico, fue la renuncia (*relinquishment*) del Congreso de Estados Unidos "a su control sobre la organización de los asuntos locales de la isla, y como resultado Puerto Rico, como los estados, es una entidad política autónoma, soberana sobre los asuntos no gobernados bajo la Constitución de Estados Unidos." *Íbid.* Véase además, *Calero Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 664 (1974); *Examining Board v. Flores de Otero*, 426 U.S. 572 (1976); *Rodríguez v. Popular Democratic Party*, 457 U.S. 1 (1982).

Esta renuncia del Congreso a sus poderes plenarios sobre un territorio puede hacerse total o gradualmente. Así lo expresó en 1971 el entonces Assistant Attorney General, del Departamento de Justicia de Estados Unidos, William Rhenquist:

> [T]he Constitution does not inflexibly determine the incidentes of terrorial status, i.e., that Congress must necessarily have the unlimited and plenary power to legislate over it. Rather, Congress can gradually relinquish those powers and give what was once a Territory an ever-increasing measure of self-government. Such legislation could create vested rights of a

> political nature, hence it would bind future
> congresses and cannot be 'taken backward' unless
> by mutual agreement."

W. Rhenquist, Memorandum, *"Micronesian Negotiations"*, 18 de agosto de 1971, Office of Legal Counsel, citado en R. Hernández, *Hacia la Meta Final*, pág. 8.

En 1980, en *Harris v. Rosario*, 446 U.S. 651 (1980), el Tribunal Supremo de Estados Unidos dejó claro que Puerto Rico no puede considerarse como un estado y que, por tanto, el Congreso podía tratar a la Isla de manera diferente. Aunque lo resuelto en *Harris*, *ante*, ha sido objeto de múltiples interpretaciones soy del criterio de que lo único resuelto en esa ocasión fue que en virtud de la cláusula territorial Estados Unidos puede tratar de manera diferente a Puerto Rico en cuanto a programas de asistencia nutricional diseñado para los estados. En este sentido me hago eco de las palabras de don José Trías Monge cuando sostuvo que:

> la cláusula territorial puede y debe examinarse
> desde dos vertientes distintas: como fuente del
> poder del Congreso para adoptar determinada
> medida que afecte a entidades vinculadas de
> algún modo a los Estados Unidos,
> independientemente del grado de gobierno propio
> o soberanía que hayan alcanzado, y como indicio
> del *status* de tales entidades y facultad del
> Congreso para legislar para ellas prácticamente
> a su antojo.

José Trías Monge, *El Estado Libre Asociado ante los Tribunales,* 1952-1994, 64 Rev. Jur UPR 1, en la pág. 26.

En consecuencia, es evidente que Puerto Rico mantiene una relación *sui generis* con Estados Unidos, toda vez que

ésta no puede compararse con un estado de Estados Unidos ni tampoco con un territorio bajo los poderes plenarios del Congreso. Desde la aprobación de la Constitución del Estado Libre Asociado, Puerto Rico opera dentro de un sistema dual de soberanías similar al de los estados, más de hechura propia. En este sentido, antes de hacer cualquier análisis sobre la aplicación o no de una cláusula constitucional federal a Puerto Rico, es imprescindible considerar que "[d]esde sus inicios, la relación entre Estados Unidos y Puerto Rico ha estado sujeta al principio fundamental de que la *Constitución federal no aplica enteramente a Puerto Rico, por no ser ni haber sido nunca la isla un territorio incorporado a la Unión Americana ni formar parte integral de Estados Unidos.*" *Asoc. Importadores de Cerveza v. E.L.A.*, 171 D.P.R. 140 (2007) (Sentencia, Op. de conformidad del Juez Asociado, Sr. Fuster Berlingeri). Es por ello que en el marco de ésta no debemos perder de perspectiva que, en ausencia de expresión del Congreso, es el Tribunal Supremo federal el encargado de establecer que disposiciones de la Constitución se extienden al Estado Libre Asociado.

Dentro de este escenario es claro que en el estado de derecho vigente la cláusula de comercio interestatal no aplica a Puerto Rico. Esto, toda vez que dicha disposición no es un derecho fundamental ni tampoco ha sido extendida a Puerto Rico por el Congreso ni por Tribunal Supremo de Estados Unidos, aún cuando éste último

tuvo la oportunidad de atender el asunto tan recientemente como en el año 2008. *Véase Puerto Rico Association of Beer Importers, Inc., et al. v. Commonwealth of Puerto Rico et al.*, *certiorari* denegado el 17 de marzo de 2008. Cabe preguntarse entonces si una cláusula que no aplica a Puerto Rico en su sentido vivo puede entonces aplicar en su aspecto durmiente. Soy del criterio de que no. Principalmente porque el aspecto durmiente de dicha cláusula es una limitación al poder de los estados y Puerto Rico, claramente, no goza de ese estatus.

Hay quienes argumentan que por contener la Ley de Relaciones Federales una disposición con un lenguaje similar al jurisprudencialmente formulado para definir el llamado aspecto durmiente o negativo de la cláusula de comercio interestatal, éste se ha extendido a Puerto Rico. *Véase*, *E.L.A. v. Supermercados Amigo*, 170 D.P.R. 459 (2007) (Opinión disidente del juez asociado señor Efraín Rivera Pérez). Dicha disposición establece que en el marco del pacto establecido entre el Estado Libre Asociado y Estados Unidos, que la Legislatura de Puerto Rico no podrá establecer distinción alguna entre los productos importados de Estados Unidos o países extranjeros y los productos producidos localmente. Art. 3, Ley de Relaciones Federales, *supra*, 1 L.P.R.A. Sin embargo, lo anterior no se pude ni debe interpretar como una extensión de la cláusula de comercio interestatal en su estado durmiente al Estado Libre Asociado que como vimos limita el poder de

los **estados**. Sería jurídicamente impropio decir que dicha disposición es análoga a una prohibición total de aprobar legislación que de alguna manera esté destinada a grabar ciertos bienes y productos que provienen de Estados Unidos. Concluir así sería limitar extremadamente la capacidad de imponer impuestos de nuestra Asamblea Legislativa.

Como vemos, está diáfanamente establecido que Puerto Rico, al no ser un estado, no queda afectado por la cláusula de comercio interestatal en su aspecto vivo, mucho menos en su aspecto durmiente. *Véase* Ley de Relaciones Federales, *supra*, art.38; *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964). En el ámbito federal, como expresáramos anteriormente, el Tribunal Supremo de Estados Unidos ha rehusado a resolver si dicha cláusula aplica a Puerto Rico. Si bien los foros federales han expresado que la cláusula en controversia en su aspecto durmiente sí aplica al Estado Libre Asociado tales expresiones no vinculan a este Tribunal. *Véase*, *Trailer Marine Transp. Corp v. Rivera Vázquez*, 977 F.2d 1 (1992).

En lógica se sostiene que si un término se usa en diferentes sentidos en un argumento se cae en un tipo de falacia denominada equivocación. Así se reconoce que el significado de las mayorías de las palabras depende del contexto en que se encuentran. Se incurre en una falacia de equivocación cuando, dentro de un razonamiento lógico, se confunde accidental o deliberadamente el significado de

las mismas o se utilizan en una acepción que no es propia para su contexto. *Véase,* Irving M. Copi & Carl Cohen, *Introducción a la Lógica*, Editorial Limusa, D.F., 2003.

Cónsono a lo anterior, el razonamiento de la mayoría es falaz, en su variante de equivocación. Toda vez que razona como si Puerto Rico fuese estado cuando claramente no lo es y se ampara en que la autonomía conferida al Estado Libre Asociado es similar a la de los Estados de la Unión para limitar el poder que dicha autonomía, en el marco de un pacto con Estados Unidos, nos confirió. Por tanto, la extensión *ex propio vigore* de la cláusula de comercio en su aspecto durmiente a Puerto Rico es, cuando menos, equivocado.

V.

Por los fundamentos antes expresados entiendo que la Ley Núm. 95 violenta el derecho constitucional a la libertad de expresión toda vez que obliga a los peticionarios a subsidiar un mensaje contrario a sus intereses económicos. De igual manera disiento de la errónea apreciación mayoritaria sobre que la cláusula de comercio en su estado durmiente aplica a Puerto Rico.

Anabelle Rodríguez Rodríguez
Juez Asociada